THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* SAMMY CARROLL, Defendant-Appellant.

Second District    No. 76-290

Opinion filed July 25, 1977.

Ralph Ruebner and Joshua Sachs, both of State Appellate Defender's Office, of Elgin, for appellant.

Philip G. Reinhard, State's Attorney, of Rockford (Phyllis J. Perko and Martin P. Moltz, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. PRESIDING JUSTICE RECHENMACHER delivered the opinion of the court:

The defendant was charged with armed robbery, convicted in a jury trial and sentenced to not less than 5 nor more than 10 years in the penitentiary.

He appeals on the following grounds: (1) that he was convicted on the basis of an involuntary confession; (2) that his case was prejudiced by improper argument by the prosecutor, and (3) that his identification was made under suggestive circumstances.

The West End Tap, a tavern, was robbed at gun point on March 15, 1975. As a result of a police investigation one of the four men who participated in the robbery was identified and questioned. He named the

defendant as one of the robbers and the defendant was arrested on June 5, 1975, and held for questioning.

Detective Gray, who along with Detective Cronk, interviewed the defendant subsequent to his arrest on June 5, testified that after he was read his rights, defendant claimed he was in the hospital at the time of the robbery. Upon calling the hospital, the detectives discovered defendant had been admitted one week after the robbery occurred. Detective Gray admitted during cross-examination that he told the defendant that he was going to be charged with armed robbery and that the police had some leeway with the State's Attorney's office in recommending what kind of bond would be set and that, if he wanted to cooperate, "there was no reason why we couldn't recommend a low bond." Gray further testified that in response to an inquiry from defendant he told him that the bond in an armed robbery case could be "somewhere between $10,000 and $100,000." The defendant testified this conversation took place on the day of his arrest, that he was not threatened physically and he did not at that time ask to be allowed to call an attorney.

The defendant's testimony was that he had been told that his bond had been set at $20,000 but "later on after I had talked to them they came back saying my bond had been raised to $50,000."

The defendant, however, did not give Detective Gray a statement and he was placed in a cell overnight. The following morning the defendant was given his "Miranda" rights and was questioned by two different detectives, Otwell and Donnelli. At that time the defendant gave the statement which is one of the bases of appeal here. Otwell and Donnelli testified that there was no mention of the defendant's bond when they questioned him and that he gave them a statement without any reference to the bond limits. The defendant maintained, however, that the details of the statement were not supplied by him but were suggested to him by the detectives and he merely acquiesced in the statement of facts, as they prepared it. Asked by defense counsel on direct examination why he had signed the statement if it did not represent his own knowledge of the facts, the defendant said he had come to the conclusion that the only way he could be released was to sign a statement for the police and that he acquiesced in the statement prepared by the police because he "wanted to get out," and thought he would be in jail until he "cooperated." He testified that before he gave the statement Detective Donnelli had told him that if the defendant talked to him he could probably get his charge reduced and his bond lowered. Both detectives positively denied such conversation. Defense counsel, preliminary to trial, moved to suppress the inculpatory statement on the ground it was not a voluntary statement in that it was the result of coercion by the police, based on the admission by Detective Gray that he had told the defendant that if the defendant

cooperated with the police, the police might be able to get his bond reduced. The trial court denied this motion.

■▌ We do not consider Detective Gray's remarks on the first day of questioning concerning the bond limits to have been coercive to the extent that the defendant, the next day, was induced to sign a detailed statement as to his participation in a robbery which he did not commit. The defendant could hardly have supposed that he would be released from his arrest if he confessed to the crime and, if he was innocent, we think he would have to suffer a more persuasive kind of coercion than that testified to in order to induce a false confession. Moreover, while the defendant testified the police put words into his mouth in the statement he signed, this was as to the details and whether he confirmed some false or inaccurate details or not, there was not shown to have been sufficient pressure to make an innocent man sign a confession of guilt. We believe, as did the trial judge, that the defendant's confession was not rendered involuntary by the police statements in question on the previous day, and that the statement made on the following day, after the passage of a significant period of time, and after being given a fresh set of *Miranda* warnings, was legally a voluntary confession. *People v. Eason* (1976), 44 Ill. App. 3d 308, 314.

A more difficult question is raised by the defendant's contention that he was greatly prejudiced by a courtroom identification having no validity because it had no independent source. The difficulty with the prosecution of the defendant was that none of the tavern patrons who were present at the robbery could identify any of the robbers and the defendant had never been identified in a lineup. At the trial the defendant took the stand and said he was elsewhere at the time of the robbery and produced a witness—a girl friend—who so testified. The State called in rebuttal— ostensibly to place the defendant at the scene—Mrs. Grebas who was a patron of the tavern and witnessed the robbery. She testified she did not look too closely at the robbers but noticed the defendant's general appearance and clothing. She was then asked if any of the robbers was in the courtroom. Mrs. Grebas asked to have the defendant stand up. Over objections by defense counsel the court ordered the defendant to stand up and Mrs. Grebas then said "he looks familiar." On cross-examination she said that she was not identifying him because he happened to be sitting in the witness chair, that she had seen him "at the door." Further questioning by defense counsel brought out that the "door" she was referring to was the courtroom door and that she had looked through the courtroom door while she was waiting in the hall to testify, witnesses having been excluded from the courtroom. This had occurred just before she went on the stand to testify. While the witness's identification was not positive, she did not retract it under cross-examination. She admitted she

had once picked out a photo of another person as resembling the robber in question but the result of her cross-examination was a more positive identification of the defendant as one of the robbers.

The impropriety of the witness's conduct in looking through the courtroom door while the defendant was on the stand is obvious. Also obvious is the suggestiveness of the circumstances for identification purposes. On the other hand, the trial judge's remarks at the post-trial motion covering this point as grounds for a new trial, clearly indicate he was completely unaware that this excluded witness had looked in while the defendant was on the stand, until she so stated herself. No objection was made to her identification on this ground, nor was there a motion for a mistrial. Actually defense counsel, after discovering that the witness had looked into the courtroom and observed the defendant on the stand, proceeded to cross-examine the witness, resulting in a more positive identification of the defendant as one of the robbers, than had been brought out in direct examination. The objection to the witness Grebas' testimony is considered here on appeal as part of the adverse ruling on the motion for a new trial and can only be considered on that basis. As such it must be considered in the light of the trial court's discretion in evaluating the effect of the witness's testimony on the whole trial proceedings. Defense counsel, after the revelation that Mrs. Grebas had seen the defendant on the stand, proceeded to cross-examine her in an attempt to denigrate the value of her identification. There is not here any suggestion of any deliberate contrivance to allow the witness to view the defendant on the stand, there was no motion for a mistrial and the only question we must consider is whether the identification, through the circumstances which occurred here, was an error so prejudicial and of such magnitude as to justify a new trial on the basis of the post-trial motion.

It is to be noted that the trial court, having been taken by surprise by what apparently was an inadvertent violation of the exclusion order, did not have an opportunity to rule in advance as to whether the witness's testimony should be excluded. As a matter of fact, it was not until after she had made a tentative identification of the defendant, as a rebuttal witness, and was being cross-examined, that her violation of the rule excluding witnesses was revealed. We therefore do not have the classic case of a decision to be made by the trial court as to whether or not to prevent a witness from testifying after it is called to the court's attention that the witness violated the exclusion order. Even in such a case, however, the weight of the authority is clear that the decision is in the discretion of the trial court. (See *People v. Nelson* (1965), 33 Ill. 2d 48; *People v. Gibson* (1969), 42 Ill. 2d 519; *People v. Godsey* (1929), 334 Ill. 11. See also the annotations in 14 A.L.R. 3d 16, 90 (1967).) It is our opinion, therefore, that absent any evidence of plan or premeditation to violate the

court's order for the advantage of the State, the trial court was not required to take any action following the disclosure by the witness, nor did this incident, when viewed in the totality of the circumstances of the trial, constitute reversible error. It was clear from the trial court's remarks following the argument at post-trial motion that he viewed the incident as inadvertent, rather than deliberate, and as he was present in the courtroom his judgment should be accepted on that point and his discretion upheld as to its significance in the trial.

■■ Lastly, the defendant contends he did not receive a fair trial because the prosecutor was permitted to engage in improper closing argument when he expressed to the jury his own personal opinion that the defendant was guilty. It is clearly improper for the prosecutor to do this. (*People v. Rothe* (1934), 358 Ill. 52; *People v. McNeal* (1972), 8 Ill. App. 3d 109; *People v. Weathers* (1974), 23 Ill. App. 3d 907.) However, viewing the State's Attorney's remarks in the context of what preceded it, we do not feel that the statement comes within the category of statements of this import which has been condemned. The statement in question appears to have been made as a deduction from what preceded it. The remark was preceded by a summary of the confession. The State's Attorney then concluded as follows:

"If you believe as Donnelli and Otwell testified that this is a truthful statement that he gave to them and told them it was the truth, then I think, really, that's it. I think he's guilty of both counts of armed robbery."

It is obvious that if the jury believed the statement in question was given to the police voluntarily and was truthful, there could be no other conclusion but that the defendant was guilty of armed robbery. That might be a reflection of the prosecutor's legal opinion as to what the implications of the statements were, as a matter of criminal law, as well as his own personal belief. It was an obvious deduction, granting the truth of the statement and the phrase "I think he's guilty of both counts of armed robbery," does not stand by itself but is related to the inculpatory statement preceding it: the defendant could not be prejudiced any more by these concluding words than he would already be if the statement was accepted by the jury as being the defendant's own story. Even if it skirted impropriety, it fell far short of the kind of tactics which are so prejudicial as to taint the jury's verdict.

The judgment of the circuit court of Winnebago County is affirmed.

Judgment affirmed.

SEIDENFELD and BOYLE, JJ., concur.