*In re* J. A. G., a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* J. A. G., Respondent-Appellant.)

Fifth District No. 78-15

Opinion filed August 9, 1979.

John H. Reid and Patricia L. Morris, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Clyde L. Kuehn, State's Attorney, of Belleville (Raymond F. Buckley, Jr., and Gillum Ferguson, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE KARNS delivered the opinion of the court:

Respondent, J. A. G., a minor, appeals from the order of the Circuit Court of St. Clair County revoking his probation. His sole contention is that his confession to committing an act of burglary, which served as the basis for the revocation, was not voluntarily made.

On May 11, 1977, the minor was adjudged a delinquent under the *Juvenile Court Act* and was placed on probation for two years for committing the offense of theft. On August 25, 1977, the minor confessed to burglarizing the home of Mrs. Myrtle Winter on June 24, 1977. Thereafter, the State filed a petition to revoke the minor's probation, alleging the commission of that burglary. Respondent moved to suppress the confession, contending that he was not given his *Miranda* warnings prior to making the statement and further contending that he was induced to make the statement by promises of leniency. At the hearing on the motion to suppress, which motion was denied, and the subsequent revocation hearing, the following facts were presented.

＊ Arnold Rujawitz, a juvenile officer with the Belleville Police Department, testified that on August 24, 1977, he and Officer Digus were investigating a series of burglaries in the area and went to see the minor at approximately 12:30 p.m. after receiving an anonymous tip that the minor might have some information about the alleged offenses. The officers asked the minor and one of his friends if they would go to the police station and have their fingerprints taken. The minor voluntarily complied with the officers' request even though he was informed that he need not go and be fingerprinted. When the minor was informed that his prints matched those found at the scene of one of the burglaries, Officer Rujawitz told him that he had a right to remain silent. The officer also informed the minor of the following rights:

"Q. [Assistant State's Attorney] What else did you tell him?

A. [Officer Rujawitz] We asked him if he understood his rights?

＊ ＊ ＊

Q. Did you give him any other rights?

A. Yes, [J.A.G.] has been in enough and we have talked to [J.A.G.] enough. He knows he has a right to a lawyer.

Q. Did you tell him at that time?

A. Yes.

Q. Did you ask him whether or not he understood?

A. [J.A.G.] understands I am sure.

Q. Well, did you ask him that?

A. I asked him if he understood and [J.A.G.] didn't say too much. I have to take for granted he did. I can't remember if he said yes or no—

＊ ＊ ＊

Q. Did you subsequently give him any other warnings any other rights?

A. No."

Apparently when the minor thereafter admitted that he committed a series of burglaries, the officer made the following promise:

"A. [Officer Rujawitz] There was one promise made to [J.A.G.]. That promise was we would not refile petitions on him. We would turn this over to his probation officer for possible revocation. I said whatever they do, that is up to them. * * * I had no idea what his probation officer was going to do on this but no petitions were made on [J.A.G.].

Q. [Assistant Public Defender] You kept your promise?

A. Yes."

At about the time J.A.G. admitted to one of the burglaries, Officer Rujawitz telephoned the minor's mother and asked her to come to the station. According to the officer, she stayed at home as her husband had apparently taken the car to work.

At approximately 1:45 p.m., Officer Rujawitz had to leave to investigate another matter and asked Sergeant Baldwin to take a statement from the minor. The record is not clear what occurred between the time Baldwin commenced his investigation and 9 or 9:30 p.m., the time the minor was released that evening. Baldwin originally testified that he did not take the minor's statement that day because the mother, who he had called on the telephone at 2:30 p.m., was unable to come to the police station. He later testified on rebuttal that no statement was made on August 24 because he was exhausted after attempting to clarify the events of one of the burglaries and to locate the stolen merchandise. He then released J.A.G. after the minor had promised to return to the police station the next morning at 9 a.m.

J.A.G. appeared at the station on schedule the following day. The officer called the minor's mother who arrived at the station at approximately 10:45 a.m. Prior to her arrival, Baldwin and the minor drove around Belleville at which time the minor pointed out the homes he had burglarized. One of the homes was the home of Mrs. Winter. Baldwin testified that as they drove around that morning he informed the minor that "you don't have to show me these places." He also admonished the minor of the following rights:

"I told him you have a right to remain silent and you are entitled to an attorney and your [sic] entitled to your mother to be present and your father while you are doing this and he said he understands all of that but he wanted to get the thing squared up."

According to Sergeant Baldwin, he began to take J.A.G.'s statement at the police station shortly after the mother arrived. Baldwin handed the

minor a *Miranda* warning waiver of rights form which he read and signed. Baldwin asked him if he understood everything and the minor responded that he did. After the mother also read and signed the form, the officer proceeded to write out the statement while the minor related the events of the Winter burglary. The minor and his mother then read the statement and signed it. The minor appeared awake and alert and did not appear to be under the influence of alcohol or drugs. Baldwin testified that he did not threaten the minor or make him any promises.

The minor's mother testified that when she arrived at the police station on August 25, Sergeant Baldwin, Officer Rujawitz and another officer were interrogating her son and another individual, Steve Rosin. She admitted to signing the waiver form and the statement but claimed she did not read either document. Baldwin told her that she would have to make restitution and that no new charges would be filed against her son. She remembered the officer telling her that the probation officer would be notified of the events in question but added that the officers did not say anything at that time about a revocation of probation.

The mother further testified that at 3 p.m. on August 24, she and her husband called the police to determine whether they should go down to the station. A police officer informed her that Rujawitz had left for the day and further informed her that he did not know about her son being picked up. He also told her that her son was not at the station.

The minor, age 15, testified that the only time he was informed of his rights was when Baldwin handed him the waiver of rights form and told him to read it. He did not read the form but knew what it said. He also did not read the statement although he signed that document as well. He was aware of the possibility of his probation being revoked but he "wasn't thinking about it then." He was also aware of some, but not all, of his rights during interrogation by the police as he had been read his rights only a "couple of times" before.

According to the minor, the officers told him they would not press charges if he would return the merchandise and make restitution. He further testified that after he admitted to a number of burglaries on August 24, he was placed in a cell all day.

The trial court found that the minor's statement was voluntarily given and denied his motion to suppress. It thereafter found that the minor had committed the offense of burglary and revoked his probation.

. On appeal, respondent contends that the confession was not voluntarily made where he was not adequately informed of his *Miranda* rights and where the interrogating officers made offers or promises of leniency in exchange for his cooperation. The State, however, argues that under the totality of the circumstances the confession was voluntarily made.

 Recent supreme court decisions of this State have made it clear that notwithstanding technical defects in the *Miranda* warnings given a probationer in custody, his confession will be admissible at a revocation hearing so long as it is voluntary. (*People v. Knight* (1979), 75 Ill. 2d 291, 388 N.E.2d 414; *People v. Peterson* (1978), 74 Ill. 2d 478, 384 N.E.2d 348.) A determination whether a confession is voluntary depends not on any one factor, but upon the totality of the circumstances surrounding the giving of the statement. (*People v. Prude* (1977), 66 Ill. 2d 470, 363 N.E.2d 371, *cert. denied* (1977), 434 U.S. 930, 54 L. Ed. 2d 291, 98 S. Ct. 418; *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731; *People v. Stone* (1978), 61 Ill. App. 3d 654, 378 N.E.2d 263.) The test governing the admissibility of a confession "is whether it has been made freely, voluntarily and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed." (*People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, 606; *People v. Hester* (1968), 39 Ill. 2d 489, 237 N.E.2d 466, *cert. granted* (1969), 394 U.S. 957, 22 L. Ed. 2d 559, 89 S. Ct. 1310, *cert. dismissed* (1970), 397 U.S. 660, 25 L. Ed. 2d 642, 90 S. Ct. 1408.) Factors to be considered must therefore include the character of the accused, and the details of the interrogation. *People v. Stone.*

Applying these principles, we believe the trial court's finding that the confession was voluntarily made was not against the manifest weight of the evidence. Respondent, though only 15 at the time of the statement, was well acquainted with the juvenile justice system. Between 1975 and the present date, he had been repeatedly taken into custody for committing such criminal acts as theft, burglary, disorderly conduct, vandalism, shoplifting, unlawful possession of cannabis and battery. He was clearly not intimidated by the juvenile authorities and, in fact, was well acquainted with Officer Rujawitz, having referred to him by the nickname of "Gabby." Furthermore, the record established that the minor was not coerced into going to the police station on August 24, 1977, was not coerced into returning there the following day, and was never threatened by the police officers. Although the minor was not fully informed of the *Miranda* warnings until immediately prior to the confession, the trial court could reasonably believe the testimony of the officers that the minor was informed that he did not have to be fingerprinted, had a right to remain silent and have a lawyer present, and need not show the police all the homes he had burglarized. Notwithstanding these admonitions and the presence of his mother at the police station, the minor freely and voluntarily chose to make a statement. ██ It is true that Officer Rujawitz promised the youth that he would not file any new petitions and would only turn the matter over to the

probation officer. Assuming that this statement by the officer constituted an offer of leniency, it is nevertheless firmly established that such offers do not necessarily render a confession involuntary. (See *People v. Charboneau* (1977), 46 Ill. App. 3d 686, 361 N.E.2d 125; *People v. Houston* (1976), 36 Ill. App. 3d 695, 344 N.E.2d 641, *cert. denied, sub nom. Gibson v. Illinois* (1977), 429 U.S. 1109, 51 L. Ed. 2d 562, 97 S. Ct. 1143; *People v. Ruegger* (1975), 32 Ill. App. 3d 765, 336 N.E.2d 50.) It is merely one factor to be considered along with the other circumstances in determining the voluntariness of the statement. (*People v. Ruegger.*) Our review of the record reveals no evidence that the so-called promise induced the minor's decision to confess to the burglary. The minor was at all times aware that the signing of a statement might result in the revocation of his probation and was also aware that Officer Rujawitz had little or no control over the actions of the probation officer. In addition, we note that the promise, which was kept by the police, was made one day prior to the confession. In the time period between the promise and the statement, the juvenile was permitted to leave the police station for the night and was furnished full *Miranda* warnings upon his return the next morning. The taint therefore of any possible improper inducement was so attenuated that it could not serve to make the statement involuntary, especially where there were numerous other circumstances clearly indicating that the confession was freely given. (See *People v. Carroll* (1977), 50 Ill. App. 3d 946, 365 N.E.2d 1352.) In *Carroll*, the defendant confessed to participating in an armed robbery one day after a police officer promised him that the State would seek a reduction in bond in exchange for his cooperation. In finding the confession voluntary, the court cited the passage of a significant period of time between the promise and the statement and the giving of a fresh set of *Miranda* warnings on the second day as factors justifying its decision.

■ In conclusion, there was ample evidence in the present case to support the trial court's finding that the confession was voluntary. Accordingly, the order of the Circuit Court of St. Clair County revoking the minor's probation is affirmed.

Affirmed.

KUNCE and KASSERMAN, JJ., concur.