(No. 43274.-

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. ANDREW V. PRIM, Appellant.

*Opinion filed Oct. 2, 1972.—Rehearing denied Nov. 29, 1972.*

FREDERICK F. COHN, of Chicago, appointed by the court, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and ELMER C. KISSANE and STEPHEN R. KRAMER, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE RYAN delivered the opinion of the court:

This is an appeal from a conviction in the circuit court of Cook County. Defendant, Andrew Prim, was indicted with three co-defendants, Herman Ray Lockett, Grover C. Thomas, and James Williams. They were charged with three counts of armed robbery, attempted armed robbery of Mary Zelinski and murder of Mary Zelinski. Defendant was severed from his co-defendants and the jury found him guilty of each of the five charges. His sentence was from 35 to 70 years on each of the armed robbery charges, 35 to 70 years on the murder charge and 10 to 14 years on the attempted armed robbery charge, all sentences to run concurrently.

About 7 P.M. on November 22, 1968, defendant and the three co-defendants boarded a Chicago Transit Authority bus and took their positions in the various parts of the vehicle. One of them suddenly announced that it was a holdup and all of them started to move toward the front of the bus. Money was taken from some of the passengers, and the money changer and money pouch were taken from the bus driver. One of the men attempted to take Mary Zelinski's purse and as she resisted she was shot, from which wound she died. The four men fled from the bus.

Guernsey Romaine, a passenger on the bus, had known the defendant for several years and spoke to him on the bus prior to the holdup. After the police arrived, they talked to him and then went to the apartment where the defendant lived. The defendant answered the door and was placed under arrest and taken to a police station. After being advised of his constitutional rights, he gave the police an oral statement admitting his participation in the bus holdup and accompanied the police in an attempt to locate the other three men. Early the next morning an assistant State's Attorney took a question and answer statement from the defendant in the presence of a court reporter.

Defendant's first contention is that prior to the giving of the oral statement at the police station, he was not given the full warnings of his constitutional rights as prescribed in *Miranda v. Arizona, 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602*. At the hearing on the motion to suppress the statement the detective who had advised the defendant of his constitutional rights was not available to testify; however, the detective who was working with him on that night and who was in the room when the defendant was advised of his rights testified that the other detective "asked him if he was aware of his constitutional rights" and the defendant answered, "Yes." He further testified that the detective then told him that "he had a right to remain silent, that he had a right to an attorney, that if he didn't have money for an attorney the State would provide him with one, that anything he did decide to say could and would be used against him in a court of law." He was asked if he understood this and he said that he did. Defendant contends that these warnings were defective in that he was not informed that he had a right to have an attorney present at the interrogation.

The written question and answer statement which the assistant State's Attorney took from the defendant about 7 o'clock the next morning contains the following:

"Q. And you have been advised of your constitutional rights prior to this time, is that right?

A. Yes.

Q. The officer explained to you that you have a constitutional right not to give a statement, is that right?

A. Right.

Q. And they advised you that you have a constitutional right to have an attorney present?

A. Right.

Q. And if you cannot afford an attorney, that we would get one for you, is that right?

A. Yes.

Q. And you were' also told that anything you said may be used against you?

A. Yes.

Q. But knowing all these things you still want to discuss this with me, is that right?

A. Right."

These answers by defendant indicate that not only were the warnings that the detective recited given, but contrary to defendant's present contention the detective had also told him that he had the right to have an attorney present. We find that the defendant had been fully warned as required by *Miranda* prior to the oral statement made to the detectives.

Defendant also argues that the warnings which the assistant State's Attorney recited to defendant prior to taking his written statement were deficient. It is his contention that the question above quoted—"And if you cannot afford an attorney that we would get one for you, is that right?"—is insufficient to inform the defendant of his right to an appointed attorney supplied for the interrogation.

The testimony of the detective and the answers made by the defendant, as contained in the written statement, indicate that the defendant was properly advised that (1) he had a right to remain silent and did not have to give a statement, (2) that he had a right to have an attorney present, (3) that if he didn't have money for an attorney, the State would provide him with one, (4) that anything

he did say could and would be used against him. We think it is clear that when the defendant had been informed that he had a right to remain silent and didn't have to give a statement followed by the advice that he had a right to have an attorney present, he was clearly told that he had a right to have an attorney present at the contemplated interrogation and not at some future time. When defendant was further told that if he could not afford an attorney "that we would get one for you" he was clearly told that an attorney would be provided at the interrogation and not at some future proceeding. *Miranda* does not specify the precise language to be used in conveying the warnings. Certainly the holding of that case does not contemplate a ritualistic recital of meaningless words. Rather it requires an intelligent conveying to the individual involved of the rights set forth in that decision. (See *United States v. Cusumano (2d cir. 1970), 429 F.2d 378; United States v. Lamia (2d cir. 1970), 429 F.2d 373; Coyote v. United States (10th cir. 1967), 380 F.2d 305.*) It would be a strained construction of the language used by the detective to say that it conveyed a meaning that an attorney would be furnished at some future time. All of the warnings related to the giving of a statement. One part thereof viewed by itself may be subject to a different interpretation but when viewed in the context of the entire discussion it can only refer to the right to have counsel provided for the defendant at the time of the interrogation.

Defendant contends that it was error for the court to deny him the right to testify, at the hearing on the motion to suppress, that he was not aware of his right to have an attorney appointed for him prior to any interrogation. Defendant made an offer of proof to this effect. We agree that the defendant should have been permitted to deny that he understood. We consider this, however, to be harmless error. When the issue of the adequacy of the warnings is raised, it is for the court to objectively

determine whether under the circumstances the words used were sufficient to convey the required warnings. (*Coyote v. United States (10th cir. 1967), 380 F.2d 305, 308.*) We have above reviewed the language used and conclude that it clearly conveyed the warnings required. For the defendant to deny that he understood them does not weaken our conclusion. The defendant was 19 years old. He had gone to his third year in high school. It is not contended that his failure to understand is due to any lack of intelligence. We find that under these circumstances the words used were sufficiently clear to convey the warnings prescribed by *Miranda.*

Defendant further contends that he was not permitted to contact his mother while at the police station and that she was not permitted to contact him. He was arrested at his mother's apartment about 10 P.M. She was with him before he was taken to the ground floor on the elevator and again when he was in the police vehicle before being taken to the station. She was told he was arrested in connection with a murder. She requested permission to ride to the station with him which was denied but she was told that he was being taken to the Wood Street police station. However, the defendant was taken to the Maxwell Street station. He was there between one and two hours, during which time he had been advised of his rights and interrogated. Following this, he accompanied the officers on a successful search for other men involved in the holdup. They returned to the station and then left a second time on their search mission. They stopped at defendant's girl friend's apartment where, at her request, defendant was permitted to converse with her privately. After returning to the station a second time, an assistant State's Attorney was called at about 5:15 A.M., and following his arrival the written statement was taken.

Presumably the claimed refusal to permit the defendant to call his mother occurred prior to leaving the police station on the first occasion shortly after 12 o'clock. The

police officer testified that he thought the defendant had been permitted to make a phone call. Defendant's mother testified that after her son was taken by the police she called the Wood Street station and was told the defendant was not there. Then she and a friend went to the Maxwell Street station at 11:30 P.M. where she stated she was not permitted to see her son. She made no further attempt to contact him that night or the next day. Section 103—3 of the Code of Criminal Procedure (Ill.Rev.Stat. 1967, ch. 38, par. 103—3) provides that an arrested person shall have a right to communicate with a member of his family by making a reasonable number of telephone calls or in any other reasonable manner and that such communication shall be permitted within a reasonable time after arrival at the first place of custody.

We do not consider that the evidence demonstrates a violation of this statutory provision. The situation present is not one where the defendant has been deprived of an opportunity to seek the help of his family or his friends. Nor is it one where he is being held in custody unknown to, or at a place unknown to, his family. His mother was with him after he was arrested at the apartment and he could have communicated with her and she with him at that time. She knew he was being held for murder and she knew where he was being held in custody. Further, around 1 A.M. the defendant, with the police officer, stopped at his girl friend's apartment where he was permitted to talk with her in private. This statute does not give the defendant the right to have a member of his family present with him during interrogation or even to visit with him while in custody other than at regular visiting periods. The purpose of the statute is to permit a person held in custody to notify his family of his whereabouts and to notify them of the nature of the offense with which he is charged so that arrangements may be made for bail, representation by counsel and other procedural safeguards that the defendant cannot accomplish for himself while in

custody. The defendant in this case had adequate opportunity to accomplish these purposes. These facts do not demonstrate an isolation of the defendant from his family in violation of section 103—3. See *People v. Jackson, 41 Ill.2d 102; People v. Dewey, 42 Ill.2d 148.*

Whether a statement is voluntarily given depends upon the totality of the circumstances. The test is whether it has been made freely, voluntarily and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed. (*People v. Hester, 39 Ill.2d 489.*) In making its decision the trial court need not be convinced beyond a reasonable doubt, and the finding of the trial court that the statement was voluntary will not be disturbed unless it is contrary to the manifest weight of the evidence.˙(*Lego v. Twomey, 404 U.S. 477, 30 L.Ed.2d 618, 92 S.Ct. 619; People v. Higgins, 50 Ill.2d 221; People v. Johnson, 44 Ill.2d 463.*) The defendant does not contend that he was physically abused. There is no evidence in the record that his will was overcome at the time he confessed. The trial court found that the statement was voluntary. We do not think that this finding was against the manifest weight of the evidence.

We need not consider defendant's objection to his identification by the bus driver and a passenger named "Maldonado." In the defendant's statement which we have held to have been properly introduced, he admitted that he participated in the holdup and that he took the money from the bus driver. Any error involved in the identification procedure therefore would be harmless error beyond a reasonable doubt. (*Chapman v. California, 386 U.S. 18, 17 L.Ed.2d 705, 87 S.Ct. 824.*) For the same reason, other complained-of errors relating to the lineup or identification of the defendant as a participant in the holdup were also harmless errors beyond a reasonable doubt.

Relying on *People v. Scott, 29 Ill.2d 97,* and *People v. Hartgraves, 31 Ill.2d 375,* defendant claims that the court

erred in not ordering the State to produce all documents examined by the detective to refresh his recollection prior to testifying. The defendant contends that the requested material was significant because the detective who gave the *Miranda* warnings to the defendant was not present to testify and that the other detective testified as to the contents of the warnings given after he had examined certain records not prepared by him which the court had refused to order produced for the defendant. It was established by the answers defendant gave in a written statement that the officers had previously advised him of his rights as required. Viewing the entire record we cannot say that the withholding of these requested documents could have reasonably affected the verdict. The facts concerning which the requested documents could have been used by the defendant have been proved beyond a reasonable doubt by the contents of the statement which he gave to the assistant State's Attorney. Any error connected with the refusal to permit the defendant to inspect the requested documents is therefore harmless beyond a reasonable doubt. *People v. Canaday, 49 Ill.2d 416; People v. Wolff, 19 Ill.2d 318.*

After the jurors had deliberated for over four hours, they were brought into the courtroom and the court inquired:

"THE COURT: Ladies and Gentlemen, are you able to arrive at a verdict?

THE FOREMAN: No, we have not as yet.

THE COURT: Do you think you can arrive at a verdict?

THE FOREMAN: I think there is a chance, Sir."

The court then stated:

"I'm going to send you back. I just want to let you know that in a large proportion of cases absolute certainty cannot be expected. Although the verdict must be the verdict of each individual juror and not a mere acquiescence of conclusions of others, yet you should examine the question submitted with proper regard and

deference to the opinions of each other and you should listen to each other's opinions with the disposition to be convinced.

It is your duty to decide the case if you can conscientiously do so. If you should fail to agree on a verdict, the case must be retried. And a future jury must be selected in the same manner and from the same source as you have been chosen. And there is no reason to believe that the case would ever be submitted to 12 men and women more competent to decide. Nor can the case be tried any better or more exhaustively than it has been here or that more clear evidence could be produced on behalf of either side. Now you can retire now and reconsider the verdicts in this case."

Fifteen minutes later the jury returned with the verdict of "guilty."

Defendant characterizes this as an "Allen" instruction and contends that the giving of such an instruction is error. Supplemental instructions of this type given to juries that are unable to reach verdicts are commonly referred to as "Allen charges," taking the name from *Allen v. United States (1896), 164 U.S. 492, 41 L.Ed. 528, 17 S.Ct. 154,* wherein the Supreme Court approved the giving of such an instruction. Since that decision, however, the propriety of the giving of such an instruction has been the subject matter of countless appeals with varying degrees of acceptance, rejection and criticism of the instruction. (See Annot. (1965), 100 A.L.R. 2d 177.) A source of many appeals lies in the numerous variations of the original "Allen charge" that have been improvised by the trial courts which have been the subject matter of legal writings. (See Comment, Deadlocked Juries and Dynamite: A Critical Look at the "Allen Charge," 31 U. Chi. L. Rev. 386 (1964); Note, Due Process, Judicial Economy and the Hung Jury: A Reexamination of the Allen Charge, 53 Va. L. Rev. 123 (1967); Notes and Comments, On Instructing Deadlocked Juries, 78 Yale L.J. 100 (1968).) It is sufficient to note that such an instruction has been severely criticized and the future giving of the same

discouraged or prohibited in certain jurisdictions. See *United States v. Fioravant (4th cir. 1969), 412 F.2d 407; United States v. Brown (7th cir. 1969), 411 F.2d 930; State v. Thomas (1959), 86 Ariz. 161, 342 P.2d 197; State v. Randall (1960), 137 Mont. 534, 353 P.2d 1054.*

The basis of the criticism generally centers on the coercive nature of the charge which contains the language, the effect of which is to urge those in the minority on the jury to re-evaluate their positions giving consideration to the fact that the majority of the jury who heard the same evidence have taken a different position. It is to be noted that the instruction given in this case does not contain such language. Although conforming in other respects to a typical "Allen charge," that portion which has been the subject of most of the criticism of such a charge was deleted by the court in the giving of this instruction.

The Illinois Judicial Conference Committee on Pattern Jury Instructions in Criminal Cases has not included in Illinois Pattern Jury Instructions—Criminal an instruction to be given to deadlocked juries; however, the Illinois Supreme Court Committee on Pattern Instructions has provided in Illinois Pattern Jury Instructions—Civil an instruction to be given to deadlocked juries (IPI—Civil 1.05) and in the Comments to this instruction cites several criminal cases as authority for the giving of the same.

Two recent appellate court cases in this State have criticized the giving of a supplemental instruction to a deadlocked jury. In *People v. Richards, 95 Ill.App.2d 430,* a true "Allen charge" was given to a jury which the foreman had stated "was hopelessly deadlocked." In addition to the language used in the instruction now being considered the instruction in *Richards* also stated:

> "If a much larger number of jurors favor conviction, a dissenting juror should consider the reasonableness of his doubt when it makes no impression upon the minds of other jurors, equally intelligent and impartial, and who have heard the same evidence. If upon the other hand, the majority favors acquittal, the minority should ask them-

selves whether they might not reasonably doubt the correctness of their judgment."

The court condemned the "heed the majority" theme of the instruction and by the use of clear language discouraged the future giving of such an instruction: "[W]e cannot permit the instruction given on this record to operate as both the basis for defendant's conviction, as well as the foundation for its encouraged use in the future." 95 Ill.App.2d at 442.

In *People v. Mills, 131 Ill.App.2d 693, 268 N.E.2d 571,* the trial court had given instruction IPI–Civil 1.05 to a deadlocked jury in a criminal case. This instruction contained nothing of the "heed the majority theme" criticized in *Richards.* However, the appellate court concluded that no deadlocked instruction should be given to a jury in a criminal case and that the giving of such an instruction constituted prejudicial error.

While acknowledging the possible coercive dangers inherent in a supplemental instruction given to a deadlocked jury, we do not feel that a jury should be left to grope in such circumstances without some guidance from the court. Jurors, and especially those voting in the minority, conceivably could feel a coercive influence if when seeking guidance from the court they are met with stony silence and sent back to the jury room for further deliberation. See Comment, Deadlocked Juries and Dynamite: A Critical Look at the "Allen Charge," 31 U. Chi. L. Rev. 386, 393.

The American Bar Association Project on Minimum Standards for Criminal Justice has considered the problem of the supplemental instruction to deadlocked juries and has included its recommendation in its Standards Relating to Trial by Jury. (Standards Relating to Trial by Jury, Tentative Draft, May, 1968, pages 145 through 156.) These Standards provide:

"5.4 Length of deliberations; deadlocked jury.

(a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:

(i) that in order to return a verdict, each juror must agree thereto;

(ii) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

(iii) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

(iv) that in the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and

(v) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

(b) If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in subsection (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

(c) The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement."

Although the advisory committee recommended no specific instruction, the Standards quoted do set forth five points on which a jury might properly be advised and the comments thereon refer to instruction 8.11 of Jury Instructions and Forms for Federal Criminal Cases, 27 F.R.D. 39, 97-98 (1961), as illustrative of an instruction consistent with the provisions set forth in the Standards. Because of our disposition of this issue we set forth this instruction:

"The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if

you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case."

Also the American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to The Function of the Trial Judge, Tentative Draft, June, 1972, section 5.12(b) states:

"In dealing with what appears to be a deadlocked jury, the trial judge should avoid instructions which imply that a majority view is the correct one, by complying with ABA Standards, Trial by Jury, Section 5.4."

See also Commentary, The Function of the Trial Judge, pages 75 through 77.

We are of the belief that the adoption of the above-quoted standards relating to jury trials will resolve the many questions created by the uncertainty attendant upon instructing a jury that is in disagreement. Under the supervisory authority inherent in this court as well as that conferred by section 16 of article VI of the constitution of 1970 (see *Brokaw Hospital v. Circuit Court, 52 Ill.2d 182*), we direct that hereafter the trial courts of this State when faced with deadlocked juries comply with the Standards suggested by the American Bar Association Minimum Standards Relating to Jury Trials above set forth.

As to the effect of the given instruction in this case we do not find the same objectionable on the usual "heed the majority" basis; however, we believe that all of the instruction following the words "It is your duty to decide the case if you can conscientiously do so," is not helpful to a jury reaching a verdict. In fact, telling a jury that if

they fail to agree on a verdict the case must be retried is not correct. We do not find these remarks to be coercive, however; nor do we think that they can be said to have interfered with the deliberation of the jurors to the prejudice of the defendant or to have hastened the verdict. See *People v. Golub, 333 Ill. 554.*

Defendant complains that the prosecutor in the argument to the jury stated his personal opinion of the defendant's guilt which this court has held a prosecutor may not do. (*People v. Provo, 409 Ill. 63; People v. Anderson, 406 Ill. 585.*) However, this court has held that it is proper for a prosecutor to argue or express his opinion that the accused is guilty where he states or where it is apparent that such an opinion is based solely on the evidence. (*People v. Williams, 26 Ill.2d 190, 193; People v. Jackson, 35 Ill.2d 162.*) We have reviewed the record with regard to the comments to which defendant objects and have considered them in the context of the entire argument. We conclude that the opinions expressed by the prosecutor are based on the evidence and are not expressions of his personal opinion.

Defendant further complains that he was improperly limited in drawing allowable inferences in his final argument. The objection was made to the method counsel was using to draw the inferences. He was conjecturing a supposed conversation and prosecutor stated, "Objection to what he would have said, your Honor," and the court sustained the objection. The same inference could have been drawn in a permissible manner had the defendant chosen to do so. We do not find that the defendant was prejudiced by the court's ruling.

Defendant finally contends that multiple though concurrent sentences for the five crimes of which he was convicted were improper. He does not contend that he is not legally accountable for all of the crimes but argues that since his sole act was taking money from the bus driver, multiple sentences should not have been imposed.

Section 5—2 of the Criminal Code (Ill.Rev.Stat. 1967, ch. 38, par. 5—2) provides in part:

"A person is legally accountable for the conduct of another when:

* * *

(c) Either before or during the commission of an offense and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense. ***"

The jury was instructed as to the above statutory provision and the defendant was found guilty not only of the armed robbery of the bus driver from whom he personally took money, but also of the armed robbery of a passenger, William Giersz, the armed robbery of another passenger, Ermelindo Maldonado, the attempted armed robbery of a passenger, Mary Zielinski, and of the murder of Mary Zielinski.

The armed robbery of the bus driver, of William Giersz and of Ermelindo Maldonado were three separate and distinct crimes committed by different persons or the same person at different times. The same is true as to the murder of Mary Zielinski. Separate criminal acts were involved in each case and the court properly imposed separate though concurrent sentences for each offense. *People v. Raby, 40 Ill.2d 392.*

However, as to the two crimes perpetrated against Mary Zielinski, attempted armed robbery and murder, these both arose from the same conduct and therefore but a single sentence should have been imposed; that being for the more serious offense, murder. (*People v. Stewart, 45 Ill.2d 310.*) It appears that Mary Zielinski was shot when she resisted as her purse was being taken from her.

For the reasons stated, the judgment entered on the defendant's three convictions of armed robbery and on the conviction of the murder of Mary Zielinski are affirmed and the judgment entered on the defendant's conviction of attempted armed robbery of Mary Zielinski is reversed.

*Affirmed in part and reversed in part.*