THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIAM T. CAGES, Defendant-Appellant.

First District (4th Division)   No. 78-1904

Opinion filed March 27, 1980.

James J. Doherty, Public Defender, of Chicago (Brian L. Heise, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Iris E. Sholder, and Michael M. Lorge, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE LINN delivered the opinion of the court:

At the conclusion of a jury trial in the circuit court of Cook County, defendant, William Cages, was found guilty of murder (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(1)). He was sentenced to a 100- to 200-year prison term. He appeals.

The only issue presented for review is whether the trial court erroneously denied defendant's motion to suppress the evidence of his inculpatory statement. Defendant has abandoned his contention that the trial court erred when, allegedly in the presence of the jury, the court ruled defendant's statement had been voluntarily given. The record clearly discloses that the trial court made this determination outside the presence of the jury.

We affirm.

At trial, the State's principal witnesses, Yvonne and Adrienne Allen, testified that they were with defendant and the deceased, William Bailey, on September 1, 1976, the night Bailey met his death. The evidence presented indicates that Bailey was driving his car when he began feeling ill. Yvonne, who together with Adrienne and defendant was a passenger in the car, then exchanged seats with Bailey. As she was driving, defendant wrapped a handkerchief around Bailey's throat and began choking him. Yvonne stopped the car. Adrienne screamed and told Yvonne to get out of the car. Before both Adrienne and Yvonne fled from the car, Adrienne saw that defendant was holding a knife in his hand. As both Adrienne and Yvonne were running from the car, they heard gunshots. It was later determined that Bailey died from stab and gunshot wounds. Sometime after the incident, Yvonne accompanied defendant to the State of Mississippi.

Defendant was arrested in Mississippi. Chicago police officers John Janda and Frank Laverty returned with defendant to Chicago. On their arrival with the defendant to their police headquarters, the police officers, after advising defendant of his *Miranda* rights, obtained defendant's confession to the murder of Bailey. The confession by defendant was first made orally and then in writing.

Officer Laverty testified that prior to questioning defendant, he fully explained defendant's rights to him. The defendant acknowledged that he understood the significance of his rights. Defendant then told Laverty that he had been employed by Hubert Spain, a druggist, to kill Bailey. Defendant explained that Spain had been in Federal custody on narcotics charges and, to obtain a new trial, Spain had designed an elaborate plan

which would result in framing the narcotics agents with the murder of Bailey.

Defendant described to the officers the sequence of events which led to the murder. Defendant asserted he had first attempted to poison Bailey and then to strangle him. When these efforts failed, defendant had stabbed Bailey in the chest and then had shot him in the back of his head.

On cross-examination, Laverty stated that defendant was alert during the entire interview. Laverty also asserted neither he nor Janda had ever stated or intimated to defendant that if defendant confessed to the murder of Bailey, he or the Allen sisters would get immunity or leniency. Laverty noted he had been in defendant's presence when Laverty mentioned his desire to see Spain prosecuted, but no one had made promises to defendant in exchange for his testimony. Although Laverty said to defendant that he hoped defendant could help in the prosecution of Spain, he never solicited defendant's testimony.

Assistant State's Attorney Michael Angarola, who was present when defendant's oral and written statements were made, also testified that in defendant's oral statement, defendant described how he had killed Bailey and had received money in consideration for the murder. Angarola read defendant's entire written statement to the court and the jury. The statement began with a detailed explanation of defendant's rights and defendant's statement that he was "sending [him]self to the penitentiary." Angarola repeatedly questioned defendant to determine whether he understood the ramifications of the confession and whether his statement was voluntary.

When Angarola asked defendant a question about one of the Allen sisters, defendant responded "I thought you said she wouldn't have anything to do with this." Angarola asked several other questions and defendant responded by admitting to murdering Bailey. Defendant again asked whether Yvonne was involved. The following colloquy then took place:

"Angarola: This statement pertains to you William and not to Yvonne.

Defendant: But * * *, I'm still stuck.

Angarola: Well, nobody has told you anything other than that, William, from the beginning * * * when I asked you at the beginning if you wanted to give a voluntary statement, and you answered yes, you gave the question some thought and answered yes * * * Do you want to give a voluntary statement at this time?

Defendant: What I'm saying is you know if I, you know, I only proved that I have left * * * suppose she doesn't come forth.

Angarola: * * * Yvonne's coming forth and not coming forth

has nothing to do with your case at this point. Nobody has made any promises about what would happen [to] Yvonne, and * * * you. You were told—you would, in fact, be prosecuted for this offense.

* * *

* * *If you tell me you do not wish to make voluntary statement, this statement will terminate at this point * * *

Defendant: Yes, but I understood something else.

Angarola: What else did you understand? There is a court reporter taking down the statement * * *

Defendant: No response.

Angarola: When I came into the room today, I informed you that any questions of immunity and anyone who would be prosecuted were not questions for me to decide. I can give you no assurance of who would be prosecuted * * * you specifically were told you, in fact, would be prosecuted.

Defendant: I understood nobody would be prosecuted but myself and Hubert.

Angarola: The decision to prosecute is that of the State's Attorney * * *

Defendant: I thought you were the State's Attorney.

Angarola: I'm an assistant State's Attorney * * * and my opinion is given when asked, but I have never given you any assurance that anyone in particular would not be prosecuted in this case."

On cross-examination, Angarola testified that nothing had been promised implicitly or explicitly to defendant in exchange for his statement. Prior to questioning defendant, Angarola asserted he did not say anything about the Allen sisters. Angarola also denied discussing the sisters directly with defendant prior to taking of defendant's oral and written statements.

Angarola further testified that defendant raised the question of immunity sometime between the taking of his oral and written statements. Angarola specifically denied having had any prior conversation with defendant relating to the prosecution of defendant's family members. Angarola also stated he did not ask defendant to aid in Spain's prosecution nor did he promise defendant that no charges would be brought against the Allen sisters. Angarola further claimed that defendant did not discuss these two subjects in Angarola's presence.

After the State rested its case, the trial court excused the jury and held a hearing to determine the voluntariness of defendant's statements. The trial court has previously ruled that it would not hear defendant's motion to suppress the written statement, filed after jury selection, until the

evidence presented at trial indicated a hearing on that issue was warranted. The trial court further indicated the possibility that the motion might well be both untimely and dilatory in nature.

Officer Janda's subsequent testimony corroborated the testimony of Laverty and Angarola. Although admitting that he and Laverty wanted to see Spain prosecuted, neither he nor his partner had made any promises to defendant. Before Angarola arrived, they had informed defendant they had "no right to promise him, * * * anything as far as prosecution. It was strictly a state's attorney matter."

During the hearing on the suppression motion, defendant testified he had never confessed to the murder of Bailey. He also asserted he had never made a statement in front of a court reporter. He denied making the statements which Janda, Laverty, and Angarola attributed to him. Defendant further stated that prior to Angarola's arrival, Laverty had said they would see to it that he received the minimum sentence or possibly immunity if his testimony was sufficient to prosecute Spain. He further stated the officers promised the Allen sisters immunity if defendant gave the police information leading to Spain's prosecution.

Defendant then related that some five or 10 minutes after this initial conversation, an Assistant State's Attorney arrived. The Assistant State's Attorney also promised defendant a reduced sentence if defendant cooperated and assured defendant that no one else would be prosecuted if defendant was helpful in the prosecution of Spain. Defendant additionally claimed that when he spoke with the police officers, he had been without sleep for 36 to 48 hours.

Outside the presence of the jury, the trial court denied defendant's motion to suppress and stated "for the purposes of admissibility the statements were made voluntarily." Following closing arguments, instructions and deliberations, the jury returned a verdict finding defendant guilty of murder.

## Opinion

Defendant contends the trial court erred in ruling his statements voluntary and thus admissible when in fact defendant was coerced into making the statements by promises of leniency and immunity. Defendant argues his motion to suppress should have been allowed.

The basic guidelines used to determine whether an incriminating statement has been voluntarily given so as to be admissible in evidence were set forth in *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. In *Miranda*, the court pointed out that a statement given freely and voluntarily without compelling influences is admissible. Particularly in the context of custodial interrogation without the presence

of counsel, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self incrimination and his right to retained or appointed counsel [citation]." *Miranda v. Arizona* (1966), 384 U.S. 436, 475, 16 L. Ed. 2d 694, 724, 86 S. Ct. 1602, 1628.

■■ When a defendant challenges the voluntariness of his statement, the State must first show that, before being interrogated, defendant was adequately warned of his right to counsel and his privilege against self incrimination. (*People v. Ruegger* (1975), 32 Ill. App. 3d 765, 336 N.E.2d 50.) In determining whether the State has sustained its burden of demonstrating that the evidence as a whole discloses a statement was made voluntarily, the trial court need not be convinced beyond a reasonable doubt. The trial court's finding will not be disturbed on review unless it is contrary to the manifest weight of the evidence. *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601; *People v. Higgins* (1972), 50 Ill. 2d 221, 278 N.E.2d 68; *People v. Ruegger* (1975), 32 Ill. App. 3d 765, 336 N.E.2d 50.

■■ Whether a statement is voluntarily given depends upon the totality of the circumstances. The test is whether it has been made freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed. (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601; *People v. Hester* (1968), 39 Ill. 2d 489, 237 N.E.2d 466.) Admonitions to tell the truth and advisement to make statements are not considered sufficient in themselves to render a statement involuntary. *People v. McCue* (1977), 48 Ill. App. 3d 41, 362 N.E.2d 760; *People v. Jones* (1972), 8 Ill. App. 3d 849, 291 N.E.2d 305.

The record in the instant case clearly supports the trial court's ruling that defendant's statement was voluntary, and therefore admissible. Officer Laverty testified he gave defendant a full explanation of his rights prior to questioning him. Officer Janda's testimony substantially corroborated Laverty's testimony. Assistant State's Attorney Angarola testified he gave defendant his *Miranda* warnings both before his oral statement and before his written statement.

■■ Further, defendant's written statement shows that defendant was fully aware of these rights. When asked after each specific right whether he understood it, he answered yes. (*People v. Johnson* (1969), 112 Ill. App. 2d 148, 251 N.E.2d 393. See also *People v. Higgins* (1972), 50 Ill. 2d 221, 278 N.E.2d 68.) He also stated, "I am sending myself to the penitentiary." This evidence, coupled with testimony of the officers and the Assistant State's Attorney, sufficiently demonstrated to the trial court that the State met its burden of showing defendant's knowing and intelligent waiver of his privilege against self-incrimination.

Defendant argues that inconsistencies between the officers' and Assistant State's Attorney's testimony render their testimony incredulous. Defendant asserts that his testimony is consistent and therefore more believable. At the hearing, defendant denied making an oral or written statement. He also testified that promises of leniency and immunity were made to induce his confession. Defendant's written statement, as well as other testimony, directly contradicts these assertions. See, *e.g., People v. Ruegger* (1975), 32 Ill. App. 3d 765, 336 N.E.2d 50.

■ When the evidence is conflicting, it is the duty of the trier of fact to determine the credibility of the witnesses and the weight to be given their testimony. On review, this court will not substitute its judgment for that of the trier of fact. (*People v. Donalson* (1977), 50 Ill. App. 3d 678, 365 N.E.2d 658; *People v. Johnson* (1969), 112 Ill. App. 2d 148, 251 N.E.2d 393; see also *People v. Aldridge* (1980), 79 Ill. 2d 87.) The trial court resolved the conflicts in testimony in favor of the State. We cannot find that this resolution is against the manifest weight of the evidence.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

JOHNSON and JIGANTI, JJ., concur.