2020 IL App (1st) 180260-U
Order filed: September 4, 2020

FIRST DISTRICT
FIFTH DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 1413(01) |
| | ) | |
| TREVONTI CARSON, | ) | Honorable |
| | ) | James Michael Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Delort and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirmed defendant's conviction of first degree murder, finding no ineffective assistance of counsel. We vacated defendant's 2012 conviction for aggravated unlawful use of a weapon pursuant to *Aguilar*.

¶ 2    A jury convicted defendant, Trevonti Carson, of first degree murder and attempted first degree murder and found that during the commission of those offenses he personally discharged a firearm that proximately caused the death of Devonte Diggins and that caused great bodily harm and permanent disfigurement to Robert Gladney. The court sentenced defendant to a total of 76

years' imprisonment. On appeal, defendant contends that his trial counsel provided ineffective assistance by allowing him to be impeached with a prior 2012 conviction for aggravated unlawful use of a weapon (AUUW) without objecting that the conviction was invalid under *People v. Aguilar*, 2013 IL 112116 and its progeny (collectively, *Aguilar*). First, defendant asks us to vacate his 2012 AUUW conviction under *Aguilar*. Second, he asks us to reverse and remand for a new trial in this case on the first degree murder and attempted first degree murder counts based on counsel's ineffectiveness for failing to make an *Aguilar* objection to the admission of his 2012 AUUW conviction for impeachment purposes. For the reasons that follow, we vacate defendant's 2012 conviction for AUUW under *Aguilar*. However, we affirm defendant's conviction for first degree murder and attempted first degree murder because counsel's alleged ineffectiveness in failing to make an *Aguilar* objection did not prejudice him.[1]

¶ 3    At trial, Robert Gladney testified that on November 13, 2013, he went to a gas station at 810 West 59th Street in Chicago, in the afternoon with his cousin, Devonte Diggins. When he entered the convenience store connected to the gas station, Gladney saw Malik Burnett. Gladney had been dating Burnett's wife, Lady Wright, for the past 18 months. When he first began dating Lady, Gladney did not know that she was married to Burnett.

¶ 4    When Gladney entered the store, Burnett removed his jacket and put up his fists as if to fight him. Gladney told Burnett that he did not want to fight and he extended his hand toward Burnett and told him that everything was all right. Gladney shook hands with Burnett, pulled him into a hug, tapped him on the back, and kissed him on the cheek. He and Burnett talked for several

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order stating with specificity why no substantial question is presented.

minutes while Burnett was on his cell phone. Thinking that Burnett was talking to Lady on the cell phone, Gladney tried to take the phone out of his hand. Burnett refused to give Gladney the phone.

¶ 5    Burnett ran toward the door and then pointed at Gladney, who saw three or four men in the doorway and another man directly in front of him wearing a green hoodie and holding a gun. Gladney had never before seen the man with the gun or the other men in the doorway. Gladney ran to the back of the store, and subsequently saw Burnett holding his cousin Diggins against the wall. Gladney threw soda bottles at Burnett so as to get him to release Diggins. Gladney then saw the man with the gun in the next aisle, and he threw bottles at him too. Burnett said, "pop his ass," and he heard two gunshots. Gladney ran toward the front door of the store and was shot in his arm.

¶ 6    Gladney exited the store and was taken by ambulance to the hospital, where he told police that he did not know the identity of the shooter. The police came to his home the next day and showed him some photo arrays. Gladney identified Burnett in one photo array but he was not able to identify anyone in the other photo arrays.

¶ 7    Gladney testified that he was awaiting trial on charges of aggravated kidnapping and attempted aggravated criminal sexual assault. No promises of leniency were made to him to secure his testimony.

¶ 8    Surveillance video from the gas station convenience store was played at trial. The video shows Burnett facing Diggins, who was standing in the doorway of the store. Diggins starts to move toward Burnett but is held back by Gladney. Burnett puts up his hands in a fighting position. Gladney comes over to Burnett, who is holding a cell phone, talks with him, shakes his hand, and pulls him in for a hug. The video subsequently shows Diggins running down an aisle of the store and being pushed against a wall by Burnett. Gladney throws a bottle at Burnett and defendant runs over and shoots at Diggins before running back up the aisle.

¶ 9     Davon Carson, defendant's cousin, testified that he and Burnett went to the gas station convenience store. Before entering the store, they saw Gladney and Diggins. Gladney displayed a gun and said to Burnett, "Do you know what time it is [expletive]?" Later, inside the store, Gladney and Diggins began arguing with Burnett. Diggins told Burnett that he had come all the way from "Cali" to kill him. Gladney grabbed Burnett and pulled him close. Burnett made a phone call and several people showed up, including defendant. Gladney and Diggins began fighting Burnett. Defendant shot at Diggins.

¶ 10    Assistant State's Attorney Pat Turnock testified that on December 7, 2013, he accompanied police detectives to interview Davon Carson. Carson made a handwritten statement, but he never said that he saw Gladney with a gun before he entered the convenience store and he never stated that Diggins told them that he had flown in to kill Burnett.

¶ 11    Doctor Eric Eason testified that he performed the autopsy of Diggins and observed a gun shot wound to his upper back that went through his aorta and another gun shot wound to his abdomen. Doctor Eason determined that the gun shot wound to his back and through the aorta was lethal and that the manner of death was homicide.

¶ 12    Defendant testified that he was 30 years old and that Burnett was his younger brother. Burnett married Lady in 2010. Defendant subsequently learned that Lady was involved in an extra-marital affair with Gladney and that Gladney had physically abused her. Defendant spoke with Gladney on the phone several times. Once, Gladney told him, "If I can't have [Lady], nobody will." Another time, Gladney said, "Man, she ain't safe, y'all can't protect her, that's my [expletive]" and "we're going to catch you."

¶ 13    On the day of the shooting, defendant was taking a nap when he woke up to his wife talking on speaker phone to Burnett and Gladney. Gladney asked about Lady's whereabouts. Burnett said

she was gone. Gladney accused Burnett of lying. Defendant then heard Burnett say, "Brother, hurry up and get up here, man. They got me surrounded." Defendant asked Burnett where he was, and Burnett told him he was at the gas station a half block away. Defendant heard another voice in the background say, "Man, you already know what time it is, man, and my brother got a hit on your head." From these statements, defendant believed that Gladney was going to kill Burnett.

¶ 14    Defendant went to the gas station with his cousins, Valton and Javon. Valton had a gun, which defendant took from him. Defendant went inside the convenience store, where he saw that Burnett was in a fight with Gladney and Diggins. Defendant fired shots at Gladney and Diggins and fired two shots in the air to disperse the crowd. Defendant threw the gun away as he ran from the scene.

¶ 15    After defendant was arrested, he made a video statement to the police. At trial, defendant admitted that he told the police several lies during the video statement. Specifically, defendant admitted he lied when he: initially denied being at the gas station convenience store; stated that Burnett never called him for help; identified Javon as the shooter; stated that Burnett told him who to shoot; and stated that he fired the gun only after struggling with Gladney. Defendant testified that he subsequently told the police the truth that he went to the store because Burnett had called him and that he shot his weapon at Gladney and Diggins because he thought they were going to kill Burnett.

¶ 16    Outside the presence of the jury, the trial court ruled that it would allow the State to impeach defendant with his prior 2012 conviction for AUUW in case no. 12 CR 21440, and that if defendant did not admit to the conviction on direct examination, then the State would be allowed to introduce a certified copy of his conviction. On direct examination, defendant was asked whether he had a "2012 conviction for a gun case," and he responded yes.

¶ 17    Pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984), the trial court allowed defendant to introduce evidence of prior violent acts by Gladney and Diggins. Detective Fred Hasenfang testified that in 2012, police saw Gladney throw a gun on the ground and he was violent and aggressive at the police station after his arrest. Ravi Patel, a clerk at a liquor store, testified that in 2008, Diggins pushed him to the ground, hit him with a bottle, and stole bottles of liquor. Lady testified that in August 2012, Gladney punched her and bit her hand. In April 2013, Gladney kicked in a window, pushed her mother, and threw her to the ground. In May 2013, Gladney pistol whipped her. In October 2014, Gladney pushed her to the ground. In January 2015, Gladney kidnapped her at gunpoint and threatened to kill her and tried to rape her. Officer Lester Vaughn testified that in 2012, Gladney approached police in a threatening manner and was taken into custody after refusing to walk away.

¶ 18    The State rested in rebuttal without calling any witness or introducing into evidence the certified copy of conviction for defendant's 2012 AUUW conviction. During closing arguments, neither party mentioned defendant's AUUW conviction. The trial court instructed the jury that "evidence of a defendant's previous conviction of an offense may be considered by you only as it may affect his believability as a witness and may not be considered by you as evidence of his guilt of the offense with which he is charged."

¶ 19    During deliberations, the jury sent multiple notes indicating that it was deadlocked because one juror believed that there was insufficient evidence to make a decision. The court gave an instruction pursuant to *People v. Prim,* 53 Ill. 2d 62 (1972) and the jury returned its guilty verdicts.

¶ 20    On appeal, defendant contends that his trial counsel provided ineffective assistance by failing to make an *Aguilar* objection to the State's request that it be allowed to impeach him with his 2012 conviction for AUUW (720 ILCS 5/24-1.6(a)(2), (a)(3)(A) (West 2012)) for possessing

an uncased, loaded and immediately accessible firearm in a public alley. Defendant asks us to vacate the 2012 AUUW conviction and reverse his convictions for first degree murder and attempted first degree murder and remand for a new trial.

¶ 21    The *Aguilar* court concluded that the Class 4 form of section 24-1.6(a)(1), (a)(3)(A), (d) of the AUUW statute, which prohibited carrying on one's person or in any vehicle, outside the home, a firearm that was uncased, loaded, and immediately accessible, was facially unconstitutional under the second amendment. *Id.* ¶¶ 21-22. In *People v. Burns*, 2015 IL 117387, ¶ 25, our supreme court clarified that section 24-1.6(a)(1), (a)(3)(A) of the AUUW statute is facially unconstitutional, without limitation. In *People v. Mosley*, 2015 IL 115872, ¶ 25, our supreme court held that the reasoning in *Aguilar* extends to a conviction under section 24-1.6(a)(2), (a)(3)(A) for possession of an uncased, loaded firearm on a public way. The State here concedes that defendant's 2012 conviction for AUUW under section 24-1.6(a)(2), (a)(3)(A) was entered under the same provision of the statute found unconstitutional in *Mosley*, based on the reasoning of *Aguilar* and *Burns (*hereinafter collectively referred to as *Aguilar)*, is void *ab initio*, and should be vacated. See *In re N.G.*, 2018 IL 121939, ¶ 57 (our supreme court vacated an unconstitutional AUUW conviction relied on by the circuit court when making a fitness determination in a termination of parental rights case, finding that "if the constitutional infirmity is put in issue during a proceeding that is pending before a court, the court has an independent duty to vacate the void judgment and may do so *sua sponte*"). Accordingly, as defendant's 2012 conviction for AUUW was put in issue here, defendant's void *ab initio* challenge to that conviction is properly before us. Pursuant to *Aguilar*, we now vacate defendant's 2012 conviction for AUUW.

¶ 22    Next, we address defendant's contention that his convictions for first degree murder and attempted first degree murder should be reversed and remanded for a new trial based on his

counsel's ineffectiveness for failing to make an *Aguilar* objection to the State's request to impeach him with his 2012 AUUW conviction. To demonstrate ineffective assistance of counsel, defendant must show that his counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced him. *People v. Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Prejudice means that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Id.* Defendant must satisfy both prongs, and therefore we may dispose of a claim of ineffective assistance on either prong. *Id.* Whether defendant sufficiently alleges ineffective assistance of counsel is a question of law that we review *de novo*. *People v. Miramontes*, 2018 IL App (1st) 160410, ¶ 13.

¶ 23     The State concedes that defense counsel's performance fell below an objective standard of reasonableness when he failed to make an *Aguilar* objection so as to prevent the admission of defendant's 2012 AUUW conviction for impeachment purposes. However, the State argues that defendant suffered no prejudice at his trial in this case as a result of counsel's failure to make the *Aguilar* objection and therefore that his claim of ineffective assistance fails.

¶ 24     We agree with the State that defendant was not prejudiced by his counsel's failure to make an *Aguilar* objection so as to prevent the admission of his 2012 AUUW conviction for impeachment purposes, where he was asked only two questions about the conviction on direct examination, he was not cross-examined about it and the certified copy was not admitted, and no mention was made of the conviction during closing arguments. Also, the court instructed the jury that evidence of the prior conviction may not be considered as evidence of his guilt for the crime charged. See *People v. Woollums*, 143 Ill. App. 3d 814, 816 (1986) (improper admission of a prior conviction for impeachment purposes was harmless where the inquiry consisted of one question,

the prosecutor asked nothing about it on cross-examination, nor did he refer to it during closing argument); *People v. Scott*, 2015 IL App (1st) 131503, ¶¶ 40-42 (defendant's improper impeachment with his prior AUUW conviction that was void under *Aguilar* was harmless where he was not cross-examined about it, the State did not argue during closing that his credibility was impeached as a result of the conviction, and the trial court instructed the jury that evidence of the prior conviction must not be considered as evidence of his guilt of the charged offense).

¶ 25    Further, even if defense counsel had made an *Aguilar* objection and the AUUW conviction had been excluded, there was other evidence at trial impeaching the believability of both defendant and Carson, and supporting the testimony of Gladney, such that the result of the trial would have been the same. Specifically, defendant was impeached by his admissions at trial that he had lied repeatedly to the officers who were investigating the shooting when he told them that: Burnett had not called him; he was not present at the shooting; his cousin Javon was the shooter; Burnett told him who to shoot; and he only fired the weapon after struggling with Gladney. Carson was impeached by ASA Turnock, who testified that, contrary to Carson's testimony at trial, he never said that he saw Gladney with a gun or that he heard Diggins threaten to kill Burnett. Given all this evidence impeaching defendant's and Carson's believability as witnesses, coupled with the surveillance video corroborating Gladney's account of the shooting, there is no reasonable probability that the result of the trial would have been different if the 2012 AUUW conviction had not also been admitted for impeachment purposes. Accordingly, defendant's claim of ineffective assistance fails for lack of prejudice.

¶ 26    For the foregoing reasons, we vacate defendant's 2012 AUUW conviction in case no. 12 CR 21440. The judgment of the circuit court in the present case is affirmed.

¶ 27    Affirmed.