2023 IL App (1st) 220769-U

SECOND DIVISION
September 26, 2023

No. 1-22-0769

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21 DV 72236 |
| | ) | |
| JORGE ARROYO, | ) | |
| | ) | Honorable Callie Lynn Baird, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices Ellis and Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*: We reverse defendant's conviction and remand for a new trial. The evidence was sufficient to support defendant's conviction for domestic battery. However, the manner in which the trial court conducted jury deliberations and *voir dire* denied defendant a fair trial.

¶ 2    Following an altercation with his wife, defendant Jorge Arroyo was arrested and subsequently charged with the offense of domestic battery. He was found guilty after a jury trial. The trial court sentenced defendant to 12 months conditional discharge. Defendant now appeals his conviction. For the following reasons, we reverse, and we remand the matter for a new trial.

¶ 3                                        BACKGROUND

¶ 4     Defendant was arrested on February 6, 2021, following an altercation with his wife at their home in Chicago. He was charged with domestic battery. In the charging instrument, the State alleged that defendant was guilty of the offense of domestic battery because he "struck [his wife] about the right shoulder with his elbow causing redness to said shoulder." Defendant's case was set for a jury trial to begin on July 28, 2021.

¶ 5     Defendant's trial was held in 2021, shortly after the circuit court resumed jury trials following the Covid-19 pandemic. The trial court instructed the parties to submit potential *voir dire* questions in writing to the court the day prior to trial. The trial court rejected some of the potential questions to be posed by the defense, but agreed it could ask the venire three questions: (1) "Is there anything about the nature of the charge that causes you strong emotions one way or [an]other?"; (2) "Are you the type of individual you would want sitting on a jury if you were accused of the same allegations?"; and (3) "Do you or your family belong or contribute to organizations providing assistance or shelter for victims of domestic abuse?" The trial court similarly agreed to allow some of the potential questions posed by the State while disallowing others.

¶ 6     The State alleged in the original domestic battery complaint that defendant struck his wife and caused bodily harm. On the morning before the jury trial was set to begin, the State moved to amend the complaint to allege that defendant "made physical contact of an insulting or provoking nature with [his wife] in that he placed his elbow on her neck." Originally the charge against defendant was brought under 720 ILCS 5/12-3.2(a)(1) (West 2020) and the State sought leave to amend to bring the charge under 720 ILCS 5/12-3.2(a)(2) (West 2020). Defendant objected and argued that the State did not have an automatic right to amend the complaint on the

day of trial. Following a brief discussion about the issue, the trial court found that defendant

would not be prejudiced, and it allowed the State to amend the charge.

¶ 7    Before the trial began, the trial court informed the parties that the trial would be

"beginning and ending today." Before jury selection, defense counsel asked how far they would

go with *voir dire* before taking a lunch break. The trial court indicated that they would pick the

jury first and then take lunch afterwards. Jury selection began at 11:30 a.m.

¶ 8    Jury selection began with the trial court asking the first 20 prospective jurors preliminary

questions. After the court's examination, counsel were allowed to ask questions.

¶ 9    Defense counsel remarked that the court had informed the prospective jurors about the

nature of the case and asked the entire venire if there was "anything about the nature of this case

that causes strong feelings, one way or the other?" Prospective juror Stephanie Schulberg, among

others, raised her hand in response to the defense's question. The following exchange then took

place between defense counsel and Schulberg:

> "MR. SOTOMAYOR: . . . All right. You heard today to the charge and it caused
>
> you strong feelings. What were those feelings?
>
> PROSPECTIVE JUROR: Just quite concerned, if, being a woman and you know .
>
> . .
>
> MR. SOTOMAYOR: Okay.
>
> PROSPECTIVE JUROR: -- the background really.
>
> MR. SOTOMAYOR: So do you have a pre-deposition as you come into this
>
> courtroom about domestic battery and a charge against, in this case, a man, do
>
> you?
>
> PROSPECTIVE JUROR: An aversion, yes.

MR. SOTOMAYOR: Okay. When you say aversion, what you do mean by that?

PROSPECTIVE JUROR: Paying close attention, you know, but I can't guarantee like not feeling some – bias.

MR. SOTOMAYOR: Okay. So without hearing about this case, you come into this courtroom with a bias towards the complaining witness, right?

PROSPECTIVE JUROR: I'm sorry. What about that witness?

MR. SOTOMAYOR: Okay. The complaining witness, in other words, the person who signed the complaint, that causes this case to come to court. You have a bias towards her; correct?

PROSPECTIVE JUROR: You mean towards in the affirmative or against?

MR. SOTOMAYOR: Well, when I say a bias towards, you are sympathetic of this person, right?

PROSPECTIVE JUROR: Yes.

MR. SOTOMAYOR: And without hearing anything

PROSPECTIVE JUROR: Initially, yes."

¶ 10 The trial court called a sidebar and stated that the defense was "leading" Schulberg in an improper way. The trial court ruled that the defense could no longer ask the question about potential jurors having strong feelings that the court had previously approved. The trial court stated that if defense counsel was going to ask questions while suggesting the answers to the prospective jurors, rather than asking open-ended questions, then the court was "not going to allow [the defense] to conduct any *voir dire*."

¶ 11 Defense counsel proceeded to question several other potential jurors with the two preapproved questions remaining. Many of the potential jurors indicated that they had strong

4

feelings about the nature of the case, but, in the end, those jurors all stated that they could be fair and that, if they were the ones on trial, they would be the type of person they would want on the jury. Defense counsel strayed from the preapproved *voir dire* questions from time to time and the trial court repeatedly instructed defense counsel to return to the preapproved questions. After defense counsel questioned six of the potential jurors, the trial court told the defense that "this would be your last one. I just want to kind of move things along." The trial court called a recess at 2:20 p.m.

¶ 12     During the recess, the trial court informed the parties that it had ended *voir dire* questioning because it had been going on for almost three hours. The trial court further stated that defense counsel's questioning had gone "beyond what was a reasonable amount of time for *voir dire*." The trial court stated that counsel was "only entitled to a reasonable amount of time to conduct *voir dire*, and [the court] had given you a reasonable amount of time." Defense counsel stated that he was exploring relevant bias on the part of the potential jurors. He further noted that the charge against defendant was only a misdemeanor, but that he did not believe that justice and the ability to select a fair jury should be short-circuited because of a time constraint.

¶ 13     When the parties returned to the courtroom, the first 10 jurors were selected. The trial court brought in six more prospective jurors from which the parties were to select the final two jurors and an alternate. The trial court informed defense counsel that, during the selection of the two remaining jurors and the alternate, the defense would only be allowed to ask its third preapproved question which was, "Do you or your family belong or contribute to organizations providing assistance or shelter for victims of domestic abuse?" Defense counsel declined to question any of the remaining prospective jurors with only that question, and a jury was impaneled.

¶ 14    Jury selection ended at 3:13 p.m. The trial court indicated that the trial would begin immediately without taking a lunch break and that the jurors could eat when they deliberated. Defense counsel asked the court if they could take a 30-minute break to eat before beginning the next stage of the case. Defense counsel explained that he is diabetic and that he and the staff had been in the courtroom since 9:00 a.m. The trial court pressed defense counsel about taking the break, and defense counsel eventually relented and stated that he was ready to go. The State called Kristy Arroyo, its complaining witness and defendant's wife, as its only witness.

¶ 15    Kristy Arroyo testified that she had been in a relationship with defendant for 21 years, being married to him for the last 11 years. They have five children together. Kristy testified that, on the morning of February 6, 2021, she woke up around 6:30 a.m. to get the kids ready for school: making breakfast and getting the kids showered and ready. After breakfast, Kristy tried to initiate a conversation with defendant about a subject she raised with him earlier via a text message. Defendant ignored her overtures and continued what he was doing, washing the dishes from breakfast. Defendant put earphones in his ears and continued to ignore Kristy. She "gently" took the earphones out of his ears and told defendant to address her question. Defendant did not respond. Kristy went into the dining room to work on the laundry, and she noticed defendant's pants draped over a chair with his keys attached to the belt loop. Kristy saw a black key fob on defendant's key ring that she did not recognize. She unhooked the keys from the pants and took the keys into the children's bedroom. Defendant followed her into the room.

¶ 16    Kristy testified that when defendant entered the bedroom behind her, she held the keys under her shirt and went towards the closet to prevent defendant from getting the keys. Kristy stated that defendant "manhandled" her trying to take possession of the keys. She testified that defendant put his elbow on her neck and shoulders and pulled at her shirt. She testified that

defendant had her pinned down with his elbow and she had been pushed and shoved around. Kristy testified that she told defendant to get off of her, but he continued until he ripped her shirt and then pulled the keys away through the hole in her shirt. Kristy admitted that she then scratched defendant and dug her fingernails into his skin. Once defendant had the keys, he left the room. Kristy called the police.

¶ 17    Kristy took pictures of her injuries later in the day, and those photos were introduced into evidence. She testified that she had bruising on her right leg and thigh, redness on her shoulder and neck, and a scrape on her throat.

¶ 18    Kristy admitted she signed the initial complaint which stated that defendant struck her on her right shoulder. She testified that what actually happened was that defendant "jabbed his elbow in [her] neck." She stated that "the placement of his elbow was gripping my neck and my shoulder." Defense counsel sought to impeach Kristy in her testimony about what she was doing on the morning of the incident. She testified on direct examination that she woke up early and was getting the children ready for school. Defense counsel pointed out, however, that February 6, 2021, the date of the incident, was a Saturday. Kristy pivoted to say that she still woke up early to get the kids ready, but that it was for doing homework rather than for school.

¶ 19    After Kristy's testimony, a break was taken in the trial so the jury could eat dinner. Lunch had been skipped. The parties and the court worked on the jury instruction conference during the break. The jury instruction conference or the conclusion of the State's case occurred at around 6:45 p.m.

¶ 20    Defendant testified in his own defense. Defendant testified that, on the day in question, he woke up and was the one who made breakfast for the kids. He had to be at work at 1:00 p.m., but because Saturdays were the busiest days at work, he liked to get there early. As he was doing

the dishes from breakfast, Kristy tried to start an argument with him. Defendant put his earphones in his ears to avoid her, but she yanked them out. Kristy then took defendant's keys, which included his keys for work, and went to the children's bedroom. Defendant asked Kristy for his keys several times, but she refused. He reached out to get the keys from Kristy when she scratched him and dug her fingernails into his left arm. He then used "a little force" to pull the keys away from Kristy. After getting back the keys from Kristy, he started getting ready for work, and then he subsequently left for work. He testified that he did not hit her, swat at her, nor did he pull her shirt.

¶ 21    The jury began deliberating around 8:30 p.m. After just 30 minutes, the jury returned a verdict of guilty on the charge of domestic battery. The defense requested that the jury be polled. When Juror Louise Navidad was asked "is this now and was that then your verdict," she responded "no and no." The trial court asked for clarification, "okay, and when you were deliberating, was that your verdict?" Navidad responded, "no." After the court finished polling the rest of the jurors, the defense moved for a mistrial. The defense asserted that "we can't browbeat a person into *** [a verdict]." The courtroom sheriff informed the trial judge and the parties that Navidad was attempting to tell the sheriff that she did not want to be present in the courtroom while the verdict was being read. The sheriff was unable to finish the conversation with Navidad at the time because the judge and the parties were reentering the courtroom.

¶ 22    The trial court brought Navidad into chambers for examination. While in chambers, the trial judge pointed out to Navidad that she had signed the verdict form expressing a finding of guilty. Navidad stated that she specifically said that she wanted to be neutral based on the lack of everything she heard. Navidad clarified for the trial judge that she did not actually sign her name on the verdict form, she wrote "neutral" in the space for her name and informed the rest of the

jury that she was neutral. Navidad stated that she did not "feel like [her] conscience would allow [her] to send someone to jail *** [based on the lack of what she heard]."

¶ 23    After Navidad left chambers, defense counsel stated, "that makes it easier. It's a hung jury." The State argued that it was not a hung jury until it was determined that the jury could not deliberate any further. The trial court initially stated that "they can't continue to deliberate. That's for sure." The trial court stated that it was "going to need a minute on this one." The trial court said, "I got to call on this." When the trial judge returned, she observed that the jury had not reached a unanimous verdict. The trial court noted that the jury had only been deliberating for 30 minutes at the time they returned the verdict and indicated that the court was simply going to tell the jury to continue to deliberate.

¶ 24    Defense counsel requested that the jury be instructed about our supreme court's directive in *People v. Prim*, 53 Ill. 2d 62 (1972). In *Prim*, our supreme court provided instructions that can be given in situations where the jury seems unable to reach a verdict. The instructions are statements that inform the jury things that the "verdict must represent the considered judgment of each juror," that "[e]ach of you must decide the case for yourself," and that jurors should not "surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict." See *Prim*, 53 Ill. 2d at 75-76. The trial court indicated that it was not going to give the jurors those instructions yet. Defense counsel brought up the fact that everyone, including the jury, had been working on the case for 13 hours at that point. Defense counsel also indicated that some of the jurors did not get any food, and he expressed a concern about the jury returning to deliberations after such a long day and with so little food. The trial court indicated that the defense had made its record, but that the court was going to instruct the jury to continue to deliberate.

¶ 25 The trial judge and the parties returned to the courtroom. The trial court reminded the jury that the court had previously told them they needed to reach a unanimous verdict, but "Ms. Navidad has indicated that she is not—it's not a unanimous verdict." The trial court instructed the jury to "return to the jury room and to continue your deliberations, until you've reached a unanimous verdict." The jury began to deliberate for the second time at 9:50 p.m.

¶ 26 At 9:54 p.m., the court received a note from the jury. It was soon revealed that the note was from Navidad. The note read: "Can I be dismissed from the jurors, so the ten of them can deliberate?" The defense again requested that the jury be instructed consistent with *Prim*. The court clarified that the note had actually been handed to the sheriff before the jury began its second round of deliberations. The trial court indicated that it was going to respond to the note and tell the jurors that "you must continue to deliberate." The State had no objection, but defense counsel again stated that the jury should receive the *Prim* instruction.

¶ 27 A second jury note was received. The second note read: "If I'm unable to make a fair choice, what am I expected to do?" Defense counsel indicated that the juror, whom he presumed to be Navidad, was feeling pressure to go along with something that she did not believe in. Defense counsel argued that they should inquire if the second note was from Navidad. The State and the trial court both contended that it was irrelevant who sent the note. After the input from the parties, the trial court responded to the note by saying, "continue to deliberate."

¶ 28 A third jury note was received. The third note read: "What if we think the evidence is lacking in this case?" After input from the parties, the trial court responded to the note by saying "you have heard the evidence, follow the instructions you have been given."

¶ 29    About 30 minutes after their second deliberation started, the jury returned a verdict of guilty. The jury was polled again, and the jurors all confirmed that the guilty verdict was their verdict. Defendant was sentenced to 12 months conditional discharge.

¶ 30                                              ANALYSIS

¶ 31    Initially, we note that defendant, in his reply brief, concedes no speedy trial act violation occurred. Therefore, we will not address this issue.

¶ 32    Defendant argues the evidence was insufficient to convict him, that he was denied a fair trial when the judge limited his questions during *voir dire*, and that he was denied a fair trial when the court forced a verdict during jury deliberations. When we are presented with a challenge to the sufficiency of the evidence, we must determine whether the evidence presented at trial, when viewed in the light most favorable to the State, would allow any rational trier of fact to find that the State had proved every element of the offense beyond a reasonable doubt. *People v. Moody,* 2015 IL App (1st) 130071, ¶ 22. We review the manner in which the trial court conducted *voir dire* and jury deliberations for an abuse of discretion. See *People v. Rinehart*, 2012 IL 111719, ¶ 16 (the manner and scope of *voir dire* is reviewed for an abuse of discretion); *Freeman for Est. of Freeman v. City of Chicago*, 2017 IL App (1st) 153644, ¶ 60 (the questions surrounding whether a jury verdict was coerced are generally reviewed for an abuse of discretion). An abuse of discretion occurs where a circuit court's decision is arbitrary, fanciful, or unreasonable, or when no reasonable person would adopt its view. *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2014 IL App (1st) 130962, ¶ 23.

¶ 33                                  Sufficiency of the Evidence

¶ 34    Defendant argues that we should reverse his conviction outright on the basis that the evidence introduced at trial was insufficient. Defendant claims that the State's case hinged on the

impeached and incredible testimony of the complaining witness, Kristy Arroyo. In assessing whether the evidence against a defendant is sufficient to prove guilt beyond a reasonable doubt, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Taylor*, 186 Ill. 2d 439, 445 (1999). A defendant's conviction should not be set aside on grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that a reasonable doubt exists about the defendant's guilt. *Id.*

¶ 35    Here, defendant maintains that the State's evidence fell short of proving him guilty beyond a reasonable doubt. Defendant contends that the testimony and narrative offered by defendant himself was the "more plausible scenario" and "simply makes more sense." He points out that Kristy's testimony was impeached by the fact that she signed the initial complaint and then the allegation changed right before trial when she signed an amended complaint. Defendant also points out that none of the responding police officers testified in the State's case to corroborate anything Kristy testified about. Defendant concludes that Kristy's impeached and uncorroborated testimony, as the State's only evidence, was insufficient to prove his guilt beyond a reasonable doubt, especially in light of his more plausible testimony.

¶ 36    We find that the evidence, when taken in the light most favorable to the prosecution, was sufficient to prove defendant's guilt. To prove defendant committed the offense of domestic battery, the State had to establish that defendant knowingly and without justification made physical contact of an insulting or provoking nature with a family or household member. See *People v. Taher*, 329 Ill. App. 3d 1007, 1018 (2002).

¶ 37    Kristy Arroyo testified that defendant "manhandled" her. She testified that defendant pushed her, shoved her, pulled at her shirt, wrapped his arm around her, jabbed his elbow into

her neck, pinned her to the ground, and tore a hole in her shirt. Kristy testified that defendant caused her significant pain and that it felt terrible. She further testified she suffered soreness, redness, bruising, and a scrape to her neck. Defendant admitted to some of the physical contact with Kristy and, when asked by his own counsel if he "exceed[ed] the amount of force you felt necessary to accomplish the retrieval of your keys?" defendant answered "yes." This testimony, when taken in the light most favorable to the prosecution, was sufficient to prove defendant knowingly made physical contact of an insulting or provoking nature with Kristy. See, *e.g.*, *Taher*, 329 Ill. App. 3d at 1016-18 (evidence was sufficient to prove domestic battery where the defendant grabbed his wife by the arms, threw her to the floor, and forced his foot into her mouth); *People v. Camacho*, 2018 IL App (2d) 160350, ¶¶ 29-34 (evidence that the defendant grabbed the victim's arm in anger, put his hands around her throat, and pushed her against a wall was sufficient to support a conviction for domestic battery).

¶ 38    Defendant argues that the version of events he offered to the jury was more plausible. He further argues that Kristy's testimony was insufficient and should not have been believed because it was impeached and uncorroborated. It is the jury's role to determine whether the defendant or the complaining witness's version of events is more plausible. *Camacho*, 2018 IL App (2d) 160350, ¶ 34. Defendant's argument on this point essentially concedes that there are two plausible versions of events, and the argument does not seriously attack the sufficiency of the evidence. It is also the jury's role to decide the impact of impeachment. *People v. Nuccio*, 263 Ill. App. 3d 315, 317-18 (1994). It is the jury's role to assess credibility, and the impeachment here did not undermine the sufficiency of the evidence. *Id*. Moreover, outside corroboration of Kristy's testimony was not required. The testimony of a single witness, including the complaining witness, can be sufficient to prove the offense of domestic battery.

*Taher*, 329 Ill. App. 3d at 1018. There was sufficient evidence to support defendant's conviction and his challenges to the sufficiency of the evidence are unavailing.

¶ 39                                Fair Trial-Jury Deliberations

¶ 40    We will next address defendant's claim that he was denied a fair trial during jury deliberations. Defendant argues that he was denied a fair trial because the trial court created an unduly coercive environment for deliberations. Defendant points out that the jury was required to deliberate until after 10:00 p.m. following a long day of trial. After a juror did not sign the original verdict form and disclaimed the verdict during a jury poll, the trial court sent the jurors back to deliberate without any instructions designed to ease the coercive pressure on the dissenter.

¶ 41    After the verdict was read, defendant requested that the jury be polled. When Juror Louise Navidad was asked "is this now and was that then your verdict," she responded "no and no." The trial court asked, "okay, and when you were deliberating, was that your verdict?" Navidad responded, "no." After the court finished polling the rest of the jurors, defendant moved for a mistrial. The defense asserted that "we can't browbeat a person into *** [a verdict]." The trial court then brought Navidad into chambers for examination. While in chambers, the trial judge pointed out to Navidad that she signed the verdict form expressing a finding of guilty. Navidad pointed out that she did not, in fact, sign the verdict form, but instead she wrote "neutral" in the place for her name. Navidad said that she wanted to be neutral based on "the lack of everything she heard." Navidad stated that she did not "feel like [her] conscience would allow [her] to send someone to jail *** [based on the lack of what she heard]."

¶ 42    After Navidad left the judge's chambers, the trial judge initially stated that "they can't continue to deliberate. That's for sure." However, the trial judge later concluded that the jury had

simply not reached a unanimous verdict. The trial court noted that the jury had only been deliberating for 30 minutes at the time they returned the verdict, and the court indicated that it was going to tell the jury to continue to deliberate. When the trial judge and the parties returned to the courtroom, the trial court told the jury that, as the court had previously told them, they needed to reach a unanimous verdict, but "Ms. Navidad has indicated that she is not—it's not a unanimous verdict." The trial court instructed the jury to "return to the jury room and to continue your deliberations, until you've reached a unanimous verdict." The jury began to deliberate for a second time.

¶ 43    The jury subsequently sent out three separate notes. In the first note, Navidad asked: "Can I be dismissed from the jurors, so the ten of them can deliberate?" In the second note, the jury asked: "If I'm unable to make a fair choice, what am I expected to do?" In the third note the jury asked: "What if we think the evidence is lacking in this case?" After input from the parties, the trial court responded to the three notes with a variation of "continue deliberating."

¶ 44    Defendants in criminal cases are entitled to an uncoerced verdict from the jury. *Lowenfield v. Phelps*, 484 U.S. 231, 234 (1988). Impermissible coercion occurs when jurors "surrender their honest opinions for the mere purpose of returning a verdict." *United States v. Williams*, 819 F.3d 1026, 1030 (7th Cir. 2016). To evaluate potential coercion, a reviewing court should look to the totality of the circumstances. *Lowenfield*, 484 U.S. at 250. If the totality of the circumstances presents a clear impermissible risk of juror coercion, it can be presumed that the error prejudiced the defendant and seriously affected the fairness of the proceedings. *United States v. Banks*, 982 F.3d 1098, 1102 (7th Cir. 2020). The inquiry is objective and should focus on the situation facing the juror, not the intent of the party or the judge whose actions created that situation. *United States v. Blitch*, 622 F.3d 658, 668 (7th Cir. 2010).

¶ 45    Here, when the trial court polled the jurors, it clearly revealed that Navidad was the only dissenting juror. After Navidad disclaimed the verdict, the trial court continued the poll and revealed that there was no other dissent from the verdict. Then, Navidad was taken away from the other jurors, into the judge's chambers, where Navidad told the judge she did not believe the evidence was sufficient for a conviction. The trial court reconvened the jury in the courtroom and called out Navidad by name and expressly revealed that the jury needed to deliberate further because Navidad did not agree with the verdict, that Navidad was the one making the verdict not unanimous. The trial judge then sent the jurors back to deliberate with the admonition they must reach a unanimous verdict. At that point, it was after 10:00 p.m. and the jurors had already served 13 hours of jury duty. The trial court instructed the jurors at this time to "return to the jury room and to continue your deliberations, until you've reached a [] unanimous verdict." Navidad sent a note to the court asking to be dismissed so that the other jurors could reach the verdict without her. She clearly felt pressure to go along with the majority.

¶ 46    The law requires this court to be objective and focus on the situation facing the juror, not the intent of the party or the judge whose actions created that situation. Considering the circumstances of this case, we believe any juror in Navidad's situation would have felt significant pressure to relent. The risk of coercion was high in consideration of the totality of the circumstances. Navidad gave her honest opinions when being examined by the court in chambers following her unequivocal rebuke of the verdict during the jury poll, when she stated "no and no" that it was not her verdict at the time of deliberations nor was it her verdict at the time of the jury poll. Navidad stated in chambers that she did not sign the verdict form and instead wrote neutral. She stated that she wanted to be neutral based on "the lack of everything she heard" and she did not "feel like [her] conscience would allow [her] to send someone to jail" based on that

16

deficiency. The trial judge then called out Navidad by name in open court and revealed to all that Navidad was the lone dissenter, while informing the jury that unanimity was required.

¶ 47    The trial judge instructed the jury to "return to the jury room and to continue your deliberations, until you've reached a [] unanimous verdict." That instruction could have been interpreted by a juror, such as Navidad, that a deadlocked jury was not an option. Then, after about 30 minutes of being sent back to deliberate for the second time, Navidad voted to convict. See *People v. Ferro*, 195 Ill. App. 3d 282, 292 (1990) (brief deliberations following a trial court's instructions to a deadlocked jury are relevant to the issue of verdict coercion and invite an inference of coercion).

¶ 48    It was made clear to Navidad that she was the only one preventing a verdict from being entered and allowing everyone to go home. Anyone in her position would have felt significant pressure due to the fact that it was past 10:00 p.m. and everyone was waiting on her in order to be done after the long 13-hour day. The trial court did not tell the jury what might be done if a verdict could not be reached that day, so the jurors may well have assumed they would have to continue deliberations for the rest of the night until one side or the other relented. In fact, Navidad asked to be relieved of her duties so that the other 10 jurors, who were unanimous, could reach a verdict without her. The risk of Navidad surrendering her honest belief and deferring to the conclusions of the majority for the purpose of reaching a verdict was impermissibly high.

¶ 49    Defense counsel requested that the jury be instructed about our supreme court's directive in *People v. Prim*, 53 Ill. 2d 62 (1972). The defense wanted the jurors to be told, in accordance with *Prim*, that the "verdict must represent the considered judgment of each juror," that "[e]ach of you must decide the case for yourself," and that jurors should not "surrender your honest

conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict." See *id*. at 75-76. A *Prim* instruction was not necessarily required under the circumstances, especially because the jury was not officially "deadlocked" (*id*. at 76; *People v. Boyd*, 366 Ill. App. 3d 84, 99 (2006)), but an instruction conveying some of the principles set forth in *Prim* could have served to lessen the coercive factors at play that remained unabated in this case (*Banks*, 982 F.3d at 1104). As the supreme court observed in *Prim*, jurors in the minority "could feel a coercive influence if when seeking guidance from the court they are met with stony silence and sent back to the jury room for further deliberation." *Prim*, 53 Ill. 2d at 74. The Seventh Circuit, for example, has explained that an instruction from the court can guard against an impermissibly coercive atmosphere such as by "reminding jurors 'not to surrender their honest beliefs' just to reach a unanimous verdict." *Banks*, 982 F.3d at 1104. Here, the jury, and in particular Navidad, did not receive the type of guidance from the court that could have relieved the significant pressure to relent that was being placed on her during deliberations. Based on the totality of the circumstances, we find that an impermissible risk of juror coercion denied defendant a fair trial.

¶ 50    We recognize that defendant's trial was held in 2021 and was being held shortly after the circuit court resumed jury trials following the Covid-19 pandemic. The pandemic was ongoing at the time of trial and the record shows the lawyers, and presumably the jurors themselves were wearing facemasks to avoid being infected with or transmitting the virus. The trial court's desire to have the entire jury trial started and completed in one day was no doubt at least partially in response to the measures adopted during the pandemic. Nonetheless, defendant was entitled to a fair trial that comports with due process. Every defendant in a criminal case is entitled to a fair

trial—a trial that comports with due process. *People v. Taylor*, 357 Ill. App. 3d 642, 647 (2005). The error raised here entitles defendant to a new trial.

¶ 51                                    Fair Trial-Voir Dire

¶ 52    We have already determined that defendant was denied a fair trial due to the manner in which jury deliberations took place. For sake of completeness, we will address defendant's argument that he was denied a fair trial during the *voir dire*. Defendant argues that the trial court was so determined to finish the trial in one day that it erroneously cut him off from questioning potential jurors during *voir dire* because it was, in the trial court's opinion, taking too long.

¶ 53    The United States and Illinois Constitutions both guarantee the right to a trial by a fair and impartial jury. U.S. Const. amends. VI, XIV; Ill. Const. 1970, art. I, §8; *People v. Rinehart*, 2012 IL 111719, ¶16. *Voir dire* is one of the mechanisms that protects the defendant's right to a fair trial by allowing the defense to root out potential bias among would-be jurors. *People v. Cloutier*, 156 Ill. 2d 483, 495-96 (1993); see also *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143 (1994) ("*Voir dire* provides a means of discovering actual or implied bias."). The United States Supreme Court has explained that "[*v*]*oir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981). We review the trial court's manner and scope of *voir dire* for an abuse of discretion. *Rinehart*, 2012 IL 111719, ¶ 16.

¶ 54    In this case, the trial court had the parties submit questions for *voir dire* the day before the trial. The trial court ruled defendant could ask 3 of the 11 questions he submitted, and the State could ask 3 of the 7 it submitted. The trial court asked its own questions of the venire, then the State questioned the venire, then defendant was given the opportunity to question the venire. After defense counsel asked its first question to the whole venire, whether the nature of the case

caused anyone strong feelings one way or another, prospective juror Stephanie Schulberg raised her hand. During defense counsel's questioning of prospective juror Schulberg, the potential juror admitted to having some potential bias in favor of the complaining witness. The defense explored the matter further with questioning designed to evaluate potential bias. Eventually, the trial court found the defense's questioning to be objectionable, and it ruled that defendant was no longer permitted to ask the potential jurors the first of his preapproved *voir dire* questions — "Is there anything about the nature of the charge that causes you strong emotions one way or [the] other?"

¶ 55     Defense counsel questioned seven more of the potential jurors with just the remaining two questions permitted by the trial court. After questioning the first set of the members of the venire, the trial court called a recess and informed defense counsel that he was taking too much time. The trial court stated its belief that it had given defendant a reasonable amount of time to conduct *voir dire*, which was the requirement. The trial court ruled that defense counsel could only use its third question for selecting the remaining jurors and the alternate.

¶ 56     We find that the trial court abused its discretion by limiting defendant's *voir dire* and significantly curtailing his ability to question several potential jurors. After questioning the very first juror about potential bias, the trial court ruled that defense counsel could no longer ask one of the three questions he had been preapproved to ask. Later, after some jurors had been selected from the first set of the venire, the trial court ruled defendant could only ask one of the preapproved questions to the second set of the venire needed to fill out the jury. The two questions that the trial court prohibited defendant from asking the second set of the venire were the two questions defense counsel had successfully used to ascertain hints of bias earlier in jury selection. We find no indication in the record that the defense was needlessly prolonging *voir*

*dire* or delaying the proceedings for anything other than asking valid questions in a search for jurors who could be fair.

¶ 57    Of course, the amount of time *voir dire* might take is a relevant consideration that the trial court may take into account when deciding the manner in which to conduct jury selection. See Ill. S. Ct. R. 431(a) (West 2020). Indeed, the Supreme Court Rule governing *voir dire* specifically provides that the trial court shall permit the parties to directly question potential jurors "for a reasonable period of time." *Id*. However, in this case, defense counsel was asking just two or three preapproved questions to the members of the venire. Even when defense counsel was asking some follow-up questions after a potential juror responded in a way that indicated potential bias, counsel asked a limited number of questions. The follow-up questions were narrowly tailored to evaluate potential bias, they were not meandering or time wasting.

¶ 58    The constitutional guarantee of a fair and impartial jury includes the right to an adequate *voir dire*. *Morgan v. Illinois*, 504 U.S. 719, 729-30 (1992). "The purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath." *Cloutier*, 156 Ill. 2d at 495-96. Although not an absolute right, questioning jurors individually may take more time, but the additional expenditure of time is a small price to pay to ensure that a criminal defendant facing a deprivation of liberty is judged by an impartial jury. See *People v. Birge*, 2021 IL 125644, ¶ 113 (Neville, J., dissenting). "Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez*, 451 U.S. at 188.

¶ 59    The State argues that the trial court did not abuse its discretion in limiting the manner of *voir dire*. The State contends that *voir dire* took nearly three hours and that the amount of time was just one of the considerations the trial court took into account before limiting the scope of *voir dire*. The State argues that the trial court based its decision to limit *voir dire* on time, but also on defense counsel using leading questions, asking repetitive questions, making speeches, and asking questions that were not preapproved. The State points out that a defendant in a criminal case does not have the absolute right to question jurors on his own, so the fact that the trial court limited him from asking some questions could not deny him the right to a fair trial (citing *People v. Buss*, 187 Ill. 2d 144, 176 (1999)).

¶ 60    However, as defendant points out on appeal, the questions he asked (when he was allowed by the court to do so) revealed bias in some of the jurors that allowed him to challenge one for cause and provided him with the information to use peremptory challenges on others. For example, potential juror Alexander Smith said that he believed he could be fair in responding to the trial court's general questions. However, when defense counsel asked Smith one of the preapproved questions—if he was the type of person he would want sitting on his own jury if he were accused of domestic battery—Smith replied, "No." During follow-up questioning by the defense based on Smith's response, Smith admitted that, based on the accusation of domestic battery alone, without hearing any evidence, he could not be fair. Smith's admitted inability to be fair in the case became clear in response to defense counsel's questioning. If defense counsel had not posed the questions to Smith, the parties would have been left with only Smith's answers to the trial court's questions, which originally revealed part of Smith's bias but where Smith ultimately said he could be fair, and the parties would have had no certain indication of Smith's subsequently admitted bias that allowed him to be excused for cause.

¶ 61    A similar result obtained with regard to potential juror Schulberg. Schulberg expressed an aversion to a domestic battery case and expressed that she might have some sympathy for the complaining witness without hearing anything. While Schulberg ultimately stated that she could act as a fair and impartial juror, the defense gained information it would later use to exclude her. The defense's questions brought out potential bias that was not revealed during the trial court's questioning. Because the trial court all but cut off defendant from asking relevant questions to the potential jurors for the last few spots on the jury and the alternate, defendant was deprived of the chance to find the bias he found in Smith and Schulberg with regard to the remaining jurors who would decide his fate. Defense counsel's *voir dire* questions uncovered express, admitted bias where the trial court's *voir dire* questioning had failed to do so.

¶ 62    Although the State argues that the trial court's decision to curtail defendant's *voir dire* was not based entirely on time, the record reveals that the trial court focused almost exclusively on time when deciding to limit defendant in *voir dire*. The trial court initially ruled that the defense could ask three of the eleven questions submitted the day before trial. After questioning just one witness with some follow ups to that question, the trial court ruled defendant could no longer use it. The questions defendant was permitted to ask proved to elicit critical information to aid the defense in selecting jurors who could be fair. The trial court's subsequent reversal of its own ruling, based on the time it was taking and not on the relevance of the information that was being elicited or some other consideration, was improper. During sidebars and a recess, the trial court made repeated references to the time *voir dire* was taking. "A failure to permit pertinent inquiries to enable a party to ascertain whether the minds of the jurors are free from bias or prejudice which would constitute a basis of challenge for cause, or which would enable him to exercise his right of peremptory challenge intelligently, may constitute reversible error."

23

*People v. Strain*, 194 Ill. 2d 467, 476–77 (2000). Here, the trial court prohibited defendant from making pertinent inquiries to enable him to ascertain potential bias and gather the information to make intelligent challenges.

¶ 63     In *Strain*, 194 Ill. 2d at 470, our supreme court found that the trial court abused its discretion when it prevented a defendant from asking specific questions during *voir dire* about the potential jurors' feelings about gangs to uncover potential bias among the venire. The trial court asked the jurors only if any of the jurors was involved in a gang. *Id*. at 747. The defendant argued that more questioning was needed on the issue of gangs to root out potential bias. *Id*. The defendant observed that the trial court's question about gang involvement would not reveal other straightforward biases against gang members. *Id*. Defendant submitted proposed questions to the court which were designed to uncover bias against gang affiliation among the potential jurors, but the trial court refused to put the questions to the venire. *Id*. at 473-74. The supreme court held that the trial court abused its discretion by failing to allow the defendant the opportunity to explore the potential jurors' biases about gangs. *Id*. at 475, 481. As in *Strain*, the trial court here abused its discretion when it severely curtailed defendant's right to evaluate potential bias in the venire. The errors raised here, either individually or collectively, entitle defendant to a new trial. We reverse the conviction, and we remand for a new trial.

¶ 64                                                  CONCLUSION

¶ 65     Accordingly, we reverse defendant's conviction and remand for a new trial.

¶ 66     Reversed and remanded.