2026 IL App (3d) 250013

Opinion filed January 15, 2026

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-25-0013 |
| v. | ) ) | Circuit No. 22-CF-2008 |
| ANTHONY F. MAGGIO, | ) ) ) | Honorable Amy M. Bertani-Tomczak, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE PETERSON delivered the judgment of the court, with opinion.
Justices Brennan and Anderson concurred in the judgment and opinion.

**OPINION**

¶ 1        Defendant, Anthony F. Maggio, appeals his convictions for two counts of first degree murder. Defendant argues that the circuit court abused its discretion by denying his motion *in limine* to admit evidence of an alternative suspect on the basis that the evidence was remote and speculative. He further argues that the State failed to prove him guilty beyond a reasonable doubt, claiming that the State presented no evidence to link him to the crime scene at the time of the murders. Defendant also argues that the court abused its discretion by denying his motion for mistrial after 10 hours of deliberation and by instructing the jury to keep deliberating after the jury

stated three times that it had not reached a unanimous decision and one time that deliberations had become heated. We affirm.

¶ 2                                                    I. BACKGROUND

¶ 3         The State charged defendant with six counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2020)) for the October 2, 2020, deaths of Ashtin Eaton and her daughter, Hazel Bryant. Defendant was Hazel's father. Prior to trial, defendant filed a motion *in limine* to admit evidence of an alternative suspect. Defendant sought to admit evidence that Jordan Eaton, who was Ashtin's ex-husband and the father of her daughter, Jessica Eaton, was a suspect. The following are the factual allegations of defendant's motion. The murders occurred at approximately 1:15 a.m. Two weekends before the deaths, Ashtin and Jordan argued over an incident that happened when Jordan allowed Jessica to go to the park unsupervised. In her interview, Jessica stated that, after the park incident, Ashtin was not going to let her stay overnight at Jordan's house. Jordan had gotten upset about that. Two days after the murders, the police were called to a home next door to Shirley Ondersin (Ashtin's mother and Jessica's grandmother). Jordan had driven by and yelled. Jessica responded by locking herself in a shed. When police arrived, Jordan requested to speak with the police about visitation with Jessica. The police sought to speak with Jordan regarding the deaths but Jordan refused. A detective observed cuts on the knuckles of Jordan's right hand and the fingers of Jordan's left hand. Jordan was interviewed later that day but only agreed to participate if his girlfriend, Antanina Raspanti, was present. During the interview, Jordan admitted to pulling a gun out and discharging it in front of Ashtin in May 2011. Jordan plead guilty to Class 4 felony reckless discharge of a firearm with respect to that incident.

¶ 4         Jordan's alibi in the present case was that he was with Raspanti the night of October 1, 2020, until he went to work the morning of October 2, 2020. Raspanti's neighbor told police that

2

she saw Jordan leave the building around 9 p.m. on October 1. She did not see his vehicle in the parking lot the following morning when she left at 5:45 a.m. The neighbor also informed police that there had been several domestic disturbances at Raspanti's residence. Defendant stated that these facts could be used to argue that Jordan had the means, motive, and opportunity to commit the murders, which would cast doubt on the guilt of defendant.

¶ 5    The State filed a response to defendant's motion *in limine*. The State argued that text messages between Ashtin and Jordan did not reveal any threats or statements that would suggest Jordan had a motive to kill Ashtin. Additionally, although defendant alleged that he was at home with his fiancée, Marcelina Baliczek, at the time of the murders, Baliczek testified to the grand jury that she was a heavy sleeper and was not aware that defendant left the house to go to Ashtin's during the night 12 days prior to the murders. As for the night of the murders, Baliczek testified that defendant was home when she went to sleep and present when she woke up but she did not recall waking up in the middle of the night to confirm that defendant was at home. Defendant had also turned off his phone, so he could not be tracked when he snuck out to go to Ashtin's previously. The State further argued that Ashtin and defendant had been arguing over child support a few days prior to the murders.

¶ 6    As to the evidence of Jordan's conduct and felony charge resulting from pulling a gun and discharging it in front of Ashtin, the State argued that incident happened 10 years earlier, was remote in time, and irrelevant to any consideration of whether Jordan was a viable alternate suspect in this case. The State further argued that Jordan was excluded as a contributor to DNA evidence found under Ashtin's fingernails, the collar of her shirt, and the box cutter found near Ashtin's body. As to Raspanti's neighbor indicating that Jordan left on October 1, 2020, the State noted that during trial preparation, Jordan stated that on October 1, 2020, he took Raspanti's son to a

3

relative's house in Lockport and returned to Raspanti's home, where he remained until he went to work on October 2, 2020. Based on the foregoing, the State argued that the evidence defendant sought to introduce was irrelevant, remote in time, and speculative.

¶ 7        In reply, defendant argued that Ashtin's journal entries indicated that Jordan's behavior was an issue for Ashtin up until the time of her death. The journal entries, written by Ashtin to Jessica, indicated that Ashtin allowed Jordan to see Jessica which, according to defendant, suggested there was a period of time that Ashtin was not allowing Jordan to see her. A journal entry from June 2020 indicated that Jordan told Ashtin he did not want to see Jessica that weekend. That would have been the first weekend Ashtin allowed visitation since the COVID-19 pandemic began. Defendant argued that there was no forensic evidence linking Jordan to the crime scene. This did not mean he could be ruled out as a suspect because the killer could have worn gloves.

¶ 8        The court held a hearing on the motion *in limine*. During the hearing, defense counsel acknowledged that defendant's DNA was found under Ashtin's fingernails, on the collar of her shirt, and on a box cutter found next to her body. Defense counsel pointed out that there were mixtures of DNA, including other male DNA that was not defendant's and not Jordan's. The State argued that allowing evidence related to Jordan as a suspect would create a mini trial within the trial, as the State disputed much of what defendant alleged. For example, despite defendant's allegations regarding domestic incidents between Jordan and Raspanti, Jordan had not been arrested for domestic violence and had not been arrested since 2013.

¶ 9        The court denied the motion *in limine* and noted the following facts. The 2011 incident involving Jordan was approximately nine[1] years before the homicides. Jordan's alibi witness was

---

[1]The State argued the incident was 10 years prior, while the court stated it was approximately 9 years prior. No one disputes that the incident occurred in May 2011 and the murders occurred in October 2020, which is more than 9 years but less than 10 years later.

4

his girlfriend. Although there were statements from neighbors regarding domestic issues, no evidence was presented that Jordan had been arrested or charged in relation to any of these arguments. There was evidence that Jordan was not an ideal father figure.

¶ 10    Defendant's alibi witness was his girlfriend. However, there was evidence that defendant had previously left the home he was living in with his girlfriend, gone to Ashtin's, and returned home, all without his girlfriend's knowledge. There was DNA evidence that tied defendant to the scene but excluded Jordan. There were text messages showing an argument over child support between defendant and Ashtin.

¶ 11    After setting forth these facts, the court found that the 2011 incident was too remote in time in relation to the murders. The court further found that everything that had been presented and argued was speculative, at best. Defendant filed a motion to reconsider. During argument on the motion to reconsider, the State advised the court that it had received cell phone records for Jordan. The records showed that, on October 1, 2020, Jordan's phone was hitting on cell phone towers from Palos Hills, where Raspanti lived, to Lockport. Then, at 11:30 p.m., the phone hit on a tower in Lemont on the way back to Palos Hills. The next morning at 7:40 a.m., the phone hit on a tower in Palos Hills, as Jordan was going to work in Manhattan. The State argued that those records corroborated Jordan's statement that he took Raspanti's son to Lockport the night of October 1, 2020, and then returned to Raspanti's home, where he stayed until the next morning. The court denied the motion to reconsider.

¶ 12    The matter proceeded to a jury trial. Dr. Valerie Arangelovich testified that she was a forensic pathologist. She performed the autopsies of Ashtin and Hazel. Dr. Arangelovich testified that Hazel's cause of death was asphyxia due to smothering and her manner of death was homicide. She testified that Ashtin's cause of death was strangulation and the manner of death was homicide.

5

Ashtin had a vertical incised wound on her left forearm, but the wound did not cut into any major artery or vein, so that wound did not cause her death.

¶ 13    Detective Jacob King testified that when he called defendant to inform him of Hazel's passing, he asked defendant if the name Hazel meant anything to him. Defendant replied, "technically that's my daughter." When King told defendant that Hazel had passed "[h]e responded with a long drawn-out 'what?' " King testified that defendant was quiet. King then asked if defendant had any questions and defendant asked what happened. King advised that they would discuss it in person at a later time. During the call, King did not inform defendant that Ashtin had died, and defendant did not ask about Ashtin. King, along with commander John Arizzi, conducted an interview with defendant on October 6, 2020. During the interview, defendant informed Arizzi that he was home when he received the phone call where King advised him that Hazel had passed. Defendant's father was there but defendant did not inform his father of Hazel's passing at that time. During the interview, defendant stated that he did not try to contact Ashtin after learning of Hazel's passing.

¶ 14    Text messages between defendant and Ashtin were admitted into evidence, and King read the texts during his testimony. In the text messages from September 16, 2020, Ashtin was questioning defendant as to how he was able to go out after his fiancée, Baliczek, got home from work, when she did not trust him. Ashtin asked what he told Baliczek and questioned, "Doesn't she see your location though?" Defendant replied, "there's ways around that." Ashtin asked, "How besides your phone died? Can't work every time." Defendant responded that he does that every once in a while, but there are other ways. Ashtin questioned, "How? What, like, airplane mode or actually leave your phone somewhere else?" Defendant replied, "Now you're thinking." Texts from September 20, 2020, revealed that defendant went to Ashtin's. King testified that during

6

defendant's interview, defendant told him that Baliczek did not know that he left their home on September 20, 2020. Text messages between September 27 and 30, 2020, included discussions about child support. Defendant told Ashtin, "I can help you sometimes, but I really don't want anything done in court." Defendant repeatedly told Ashtin that he could help her sometimes. The texts indicate that Ashtin's family wanted her to go to court to get child support but she was undecided. Ashtin told defendant that it was Baliczek that told her and her family to get child support from defendant. King testified that after the text messages from September 27-30, there were no more text conversations between Ashtin and defendant on Ashtin's phone. Video of defendant's interview was played for the jury.

¶ 15        King testified that a phone extraction was conducted on defendant's phone. The extraction included location data. Essentially, the phone's location can be determined through GPS coordinates. The extraction did not show defendant's phone in Lockport (where Ashtin lived) in the early morning hours of October 2, 2020. The extraction also did not show defendant's phone in Lockport on September 20, 2020, even though defendant stated in his interview that he went to Ashtin's house on that date. Ashtin's phone number was blocked on defendant's phone. King testified that, through a subpoena, he determined that defendant was close to $10,000 in credit card debt.

¶ 16        Commander Arizzi testified that in October 2020, defendant lived with Baliczek and their two children. Baliczek was aware that defendant had a child with Ashtin. Commander Arizzi testified that the phone extraction on defendant's phone revealed text messages between him and his fiancée, Baliczek. Text messages from November 2019 show a discussion between defendant and Baliczek regarding child support and their relationship. Defendant told Baliczek that he believed their relationship could be fixed and he was "going to do everything I can to make that

7

happen." He told Baliczek that he was going to Ashtin's so she would not ask for child support. Baliczek complained that defendant would be paying money for 18 years and noted that such money could have gone towards their kids or the house they dreamed of building. She stated that things were more complicated than defendant made it seem. Defendant responded that Ashtin had not asked for money yet, so he did not believe she would. Text messages from February 2020 show that defendant told Baliczek he had a dream that he was served with child support papers and that she left him. Baliczek responded that the dream reflected defendant's fears. Baliczek told defendant to tell Ashtin he would help her if she needs money and that he should "word it that way so she gets a sense of being by herself in this."

¶ 17 Lyle Boicken testified that he had worked at the Illinois State Police Crime Laboratory. He was qualified as an expert in the field of forensic DNA analysis. DNA tests on the handle of a box cutter found near Ashtin's body revealed a mixture of DNA. Boicken testified that the DNA profile was "approximately 1.7 quadrillion times more likely if it originated from Ashtin ***, [defendant], and an unknown unrelated individual than if it had originated from Ashtin *** and two unknown unrelated individuals." He testified that the analysis provided "very strong support for the proposition that [defendant] is a contributor to the DNA profile." Jordan was excluded as a contributor to the DNA mixture on the box cutter handle.

¶ 18 Kelly Krajnik testified that she worked at the Illinois State Police Crime Laboratory. She was qualified as an expert in the field of forensic DNA analysis. She performed Y-chromosome Short Tandem Repeat (Y-STR) testing that targets only the male Y chromosome on the samples where a mixture of DNA was present. However, there was more female DNA than male DNA. Y-STR testing was conducted on the DNA extracted from Ashtin's fingernail clippings and from the neckline of Ashtin's shirt. Defendant was included as a contributor to the DNA under Ashtin's

8

right and left fingernails. There was also another unknown minor male contributor to the DNA under Ashtin's right fingernails. Jordan was excluded as a contributor to the DNA under Ashtin's fingernails. DNA from four male contributors was found on the neckline of Ashtin's shirt. The amount of DNA from three of the four contributors was so low it was not suitable for comparison. As to the remaining major contributor, defendant was included as a contributor of the DNA, and Jordan was excluded. Karl Reich was called to testify by defendant. He was qualified as an expert in the field of forensic DNA analysis. Reich testified that there were two DNA contributors on Hazel's pajamas, including a major female contributor. He testified that defendant was excluded as the minor contributor to the DNA found on Hazel's pajamas.

¶ 19    Don Crittle testified that he used to work with defendant and Ashtin. They worked together at Amazon prior to Ashtin's murder. He testified that about three weeks to a month before Ashtin's murder, defendant said to him, "I give you $10,000 if you make Ashtin disappear." At the time defendant made the statement, Crittle took it as a joke.

¶ 20    Baliczek testified that she was romantically involved with defendant. They had two children together, and they lived together. In the fall of 2019, Baliczek learned that defendant was cheating on her with Ashtin. At that time, she told defendant that she was thinking of leaving him. She testified that she and defendant had conversations regarding child support. Between January 2020 and September 2020, she was not aware of any discussions between defendant and Ashtin regarding child support. Baliczek testified that she worked on October 1, 2020, and arrived home between 10 p.m. and 11 p.m. Defendant went to bed when she did. She did not remember what time she went to bed, but it was between approximately midnight and 2 a.m. When she woke up in the morning, defendant was there. Baliczek testified that if defendant got out of the bed, she would probably wake up. She did not wake up during that night. When defendant snuck out of

their home to see Ashtin in September 2020, she assumed he was not sleeping in the same bed as her because they were arguing, but she did not know for sure. She admitted that on September 20, 2020, defendant left the apartment for hours without her knowing. She testified that she did not know how many times defendant may have snuck out. Baliczek testified that she is a sound sleeper.

¶ 21    The parties gave closing arguments, and the jury was provided instructions before beginning deliberations. During deliberations, the jury asked to see certain pictures and video, which were provided to them. The jury then asked for transcripts of defendant's interview with police. The court informed the jury that there were no such transcripts. The jury asked if both the State and defense had access to all text conversations on Ashtin's and defendant's phones. In response, the jury was told that it had all of the evidence and that it should continue to deliberate. The next note from the jury stated, "As of right now we are not unanimous on all charges. What do we do now?" The parties agreed to have the court tell the jury, "Please continue to deliberate." The next communication from the jury was a request for the text messages between Ashtin and defendant and Baliczek and defendant. The court provided the text messages. The court told the bailiff to ask if the jury wanted dinner. The court then stated that the jury knocked on the door and asked the bailiff how long they would have to stay. The bailiff told the jury to write a note to the judge. The jury wrote a note saying, "We are still at a standstill on a unanimous decision on both Hazel and Ashtin. Are we staying here tonight until we come to a unanimous decision or will we come back tomorrow? We have not made any further progress since we started." The parties agreed that the court should tell the jury to continue to deliberate and should ask if jurors wanted to order dinner. Next, the jury asked to see a photograph and then asked to see a text message. The jury was advised that the photograph did not exist and was provided the requested text. The jury sent a note saying, "Things are getting really heated in here. We need a break from each other. Are we

10

staying here all night?" The court asked the jury if it was seeking a short break or a recess until the next morning. The jury responded they wanted a break until the next morning. Additionally, one of the jurors wanted to speak with the judge.

¶ 22        The State was concerned that the jury had been at the courthouse for 12 hours at that point. Defense counsel wanted the jury to continue deliberating. The court decided not to answer the question for approximately an hour, which would result in the answer being given at 10 p.m. At 10 p.m., the State told the judge that it believed the jury should be released for the night. The court noted the jurors advised the court that they were fatigued and needed a break from one another. The court asked defense counsel his thoughts. Defense counsel requested a mistrial, saying that he believed the jury was hopelessly deadlocked and noted the jurors advised they were at a standstill multiple times and that things were getting heated. The court noted that it had not "primmed them yet"[2] and that it could do so. Defense counsel did not "want them primmed and sent home." When asked for the basis of his mistrial request, defense counsel stated that, on four separate occasions, the jury stated it could not come to a unanimous decision, things were getting heated, and the jurors had been deliberating for 10 hours. The State responded that the last note indicated things were getting heated and the jury requested a break. The State noted that the jurors did not say they were hopelessly deadlocked or that they did not think they could come to a resolution. Instead, they just asked to go home for the night. The court denied the motion for mistrial, but since the jury had been deliberating for 10 hours, the court decided to send the jurors home for the night. The court noted that three notes indicated they had not reached a unanimous decision. The court instructed the jury not to speak to anyone about the case or look at any news regarding the case. The court

_____

[2]The term "primmed" was used to indicate that the court had not provided an instruction to the jury pursuant to *People v. Prim*, 53 Ill. 2d 62 (1972). In *Prim*, the court set forth supplemental instructions for the court to provide to deadlocked juries. *Id.* at 72-77.

11

advised that they were going to recess until the next morning and the jury would then continue deliberations. The next morning, the jury continued deliberations and came to unanimous verdicts. The jury found the defendant guilty of first degree murder of both Ashtin and Hazel.

¶ 23    Defendant filed a motion for new trial. The motion argued that the State failed to prove defendant guilty beyond a reasonable doubt, the court erred by denying defendant's motion *in limine* to admit evidence of an alternate suspect, and the court erred by denying defendant's motion for mistrial. The court, however, denied the motion for new trial. Defendant was sentenced to life in prison. Defendant filed a motion to reconsider sentence, and the court denied that motion. Defendant appeals.

¶ 24                                              II. ANALYSIS

¶ 25    Defendant argues that the court denied him a fair trial by refusing to allow him to present evidence of an alternative suspect (Jordan). Specifically, he argues that the court should have allowed (1) evidence regarding the 2011 gun incident involving Jordan and Ashtin and/or Jordan's felony conviction related thereto, (2) Jordan's domestic issues with Raspanti, (3) Jordan's behavior following the murders, (4) arguments between Jordan and Ashtin regarding Jessica, and (5) Jordan's allegedly broken alibi.

¶ 26    "Evidentiary rulings are within the sound discretion of the trial court and will not be disturbed on review unless the trial court has abused its discretion." *People v. Cruz*, 162 Ill. 2d 314, 331 (1994). "An accused may attempt to prove that someone else committed the crime with which he is charged ***." *People v. Thomas*, 145 Ill. App. 3d 1, 12-13 (1986).

> "Whether what is offered as evidence will be admitted or excluded depends upon whether it tends to make the question of guilt more or less probable, and a trial court

12

may reject offered evidence on the grounds of irrelevancy if it has little probative value due to its remoteness [or] uncertainty \*\*\*." *Id.* at 13.

Noting multiple cases where alternative suspect evidence was excluded, the *Thomas* court stated:

"the appellate court decisions have generally found that remote, nonspecific, and speculative evidence that the crime could have been committed by another is properly excluded. (*People v. Smith* (1984), 122 Ill. App. 3d 609 \*\*\* (evidence that another suspect matching the description of the perpetrator who is found in the area of the crime and initially arrested excluded as remote connection with crime); *People v. Foley* (1982), 109 Ill. App. 3d 1010 \*\*\* (evidence that testifying accomplice has a brother who fits description of perpetrator of crime excluded as not showing he was involved in the crime); *People v. King* (1978), 61 Ill. App. 3d 49 \*\*\* (evidence that another person had been investigated who physically resembled perpetrator and had a prior arrest for one of the crimes charged was excluded as too conjectural).)" *Id.*

The *Thomas* court also noted that "[i]f evidence can be introduced concerning a remote or nonspecific possibility that another may have committed the crime, trials could go on *ad infinitum* and juries could become hopelessly confused with speculative evidence." *Id.* Generally, evidence may be excluded if its probative value is substantially outweighed by the danger of "confusion of the issues." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 27     Here, the May 2011 gun incident was remote in time, as it was over nine years prior to the murders. Jordan's whereabouts on the night prior to the murder were corroborated, in part, by his cell phone records. The records indicated that he went to Lockport and was returning to Palos Hills around 11:30 p.m., which is prior to the murders. His cell phone did not hit on a tower again until

13

the following morning, showing that Jordan was on his way to work. In addition, Raspanti stated that he was home with her that night, and there was no evidence that Jordan had ever snuck out of her home without her knowledge. Thus, it is mere conjecture or speculation that Jordan was or could have been in Lockport at the time of the murders. Although defendant had a similar alibi from Baliczek, there was evidence that he was able to leave their home without her knowledge and had done so 12 days prior to the murders. Further, Jordan's DNA was not found under Ashtin's fingernails, on the neckline of her shirt, or on the box cutter, while defendant's DNA was identified on all three locations. Additionally, although defendant argues that Jordan could have worn gloves, that is speculation. Further, defendant wanted to introduce evidence that Jordan had cuts on his hands the day after the murders to indicate he could have obtained the cuts during a struggle with Ashtin; however, if that had occurred, he would have likely left DNA at the crime scene.

¶ 28        The alleged domestic issues between Jordan and Raspanti, his current girlfriend, are also too remote in nature from the murders of Ashtin and Hazel. Further, Hazel had no relation to Jordan. As to the purported motive—conflicts over parenting Jessica and potential restrictions on or denial of visitation between Jessica and Jordan—there was no actual evidence provided to the court that Ashtin was not allowing visitation at the time or that she advised Jordan she would not allow visitation. There is an allegation in defendant's motion *in limine* that, during Jessica's interview, she indicated Ashtin was not going to allow Jordan to have Jessica overnight and Jordan was upset. However, the interview was not attached to the motion or otherwise presented to the court. Thus, the interview is not included in the record, and it is unclear exactly what Jessica stated. Moreover, even if Ashtin restricting Jordan's visitation with Jessica could be a motive for Jordan to murder her, it would not be a motive for him to murder Hazel. Based on the foregoing, we conclude that the court did not abuse its discretion by finding that the evidence defendant sought

14

to introduce regarding Jordan as an alternative suspect was remote and/or speculative. Additionally, we reject defendant's argument that the court placed improper weight on the DNA evidence in its decision to exclude the alternate suspect evidence, as the record shows the court considered the DNA evidence as one factor among others in reaching its conclusion. Thus, the court did not solely rely on the DNA evidence in coming to its decision.

¶ 29       In coming to our decision on this issue, we note that defendant relies heavily on our supreme court's decision in *People v. Beaman*, 229 Ill. 2d 56 (2008), and argues that *Beaman* is similar to the instant matter. However, we find *Beaman* distinguishable. First, as defendant recognizes, that matter addressed a *Brady* violation (see *Brady v. Maryland*, 373 U.S. 83 (1963)) and not specifically the admissibility of alternate suspect evidence. *Beaman*, 229 Ill. 2d at 72. Next, while the alleged alternate suspect in that matter was specifically identified as a suspect and failed to cooperate with a polygraph examination, there was no such evasive behavior in this matter as Jordan cooperated in a police interview. *Id.* at 76. Further, in *Beaman*, there was evidence that the alternate suspect had been charged with domestic battery of his girlfriend, and he was about to rekindle a relationship with the victim when she was murdered. *Id.* Here, while there were hearsay allegations of domestic issues between Jordan and Raspanti, there was no evidence presented of any charges against Jordan or specific information regarding who was the aggressor, and more importantly, there was no evidence that Jordan was going to rekindle a relationship with Ashtin. Additionally, in *Beaman*, the victim owed the alternate suspect money for drugs. *Id.* at 77. Most importantly, while the evidence against the defendant in *Beaman* was weak, including heavily disputed evidence regarding the defendant's opportunity to commit the crime, here, defendant's DNA was found on the neckline of Ashtin's shirt, on the box cutter found near her body, and under Ashtin's fingernails while Jordan's DNA was not found at the crime scene. *Id.* at 77-78.

15

Additionally, Jordan's whereabouts the night prior to and the morning of the murder were partially corroborated by cell phone records. In sum, we find *Beaman* factually distinguishable from the instant matter.

¶ 30 Next, defendant argues that the State did not prove him guilty beyond a reasonable doubt. Specifically, he argues that the State presented no evidence to link him to the crime scene at the time of the murders and relied on unreasonable inferences about when his DNA was left on Ashtin's body, her clothing, and the box cutter. Defendant does not challenge whether the State proved that Ashtin and Hazel were murdered, only whether the State proved it was him that committed the murders.

¶ 31 When defendant challenges the sufficiency of the evidence, "it is not the function of this court to retry the defendant." *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Instead, we must determine whether the evidence, viewed in the light most favorable to the State, would permit any rational trier of fact to find the elements of the offense proven beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). "This standard of review does not allow the reviewing court to substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). "[R]eviewing courts apply this standard regardless of whether the evidence is direct or circumstantial [citation], and circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction [citation]." *Id.* at 281. "[I]t is the function of the trier of fact to determine the credibility of the witnesses, the weight to be given to their testimony and the inferences to be drawn from the evidence." *People v. Akis*, 63 Ill. 2d 296, 298 (1976). A criminal conviction "will not be set aside unless the proof is so unsatisfactory, improbable or implausible as to justify a reasonable doubt as to the defendant's guilt." *People v. Slim*, 127 Ill. 2d 302, 307 (1989). "When the facts in

16

a case give rise to more than one inference, a reviewing court shall not substitute its judgment for that of the trier of fact unless the inference accepted by the trier of fact is inherently impossible or unreasonable." *People v. Price*, 225 Ill. App. 3d 1032, 1035 (1992). We must allow all reasonable inferences from the evidence in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42.

¶ 32    Here, although the State did not have direct evidence that defendant was at the crime scene at the time of the murders, or regarding exactly when defendant's DNA was left at the scene, the totality of the evidence was sufficient to prove beyond a reasonable doubt that he committed the murders. Specifically, the State put forth evidence showing that defendant's DNA was found under Ashtin's fingernails, on the box cutter that was used to cut her, and on the neckline of her shirt. Ashtin was strangled. Further, the State offered evidence of motive—specifically, that defendant did not want to pay child support for Hazel or have a relationship with her and that he wanted to save his relationship with Baliczek. Moreover, the State presented Crittle's testimony, indicating that, shortly before the murders, defendant told Crittle that he would give him money to make Ashtin disappear. Additionally, although defendant's cell phone records did not indicate he was in Lockport at the time of the murders, the State presented evidence that the defendant knew ways to avoid his cell phone being tracked. Similarly, although Baliczek testified that on the night/morning of the murders defendant was at home when she went to bed and when she woke up, she also testified that she did not know that defendant had snuck out of their home 12 days prior to the murder. Baliczek stated that she was a sound sleeper and that she did not wake up at all that night. Taking all of this together, there was sufficient evidence for the jury to make a reasonable inference that defendant's DNA was left on the box cutter when he cut Ashtin, his DNA was left on the neckline of Ashtin's shirt when he strangled her, and his DNA was left under her fingernails during

17

the murder. Thus, the State presented sufficient evidence for the jury to conclude beyond a reasonable doubt that defendant committed the murders.

¶ 33        Last, defendant argues that the court abused its discretion by denying his motion for mistrial after 10 hours of deliberation and by instructing the jury to keep deliberating. He argues that the jury made three statements that it had not reached a unanimous verdict.[3]

¶ 34        "A trial court has broad discretion in ruling upon a motion for mistrial." *People v. Willmer*, 396 Ill. App. 3d 175, 180 (2009). "The court's judgment will not be disturbed unless this discretion is shown to be clearly abused, even though the jury had earlier indicated it was hopelessly deadlocked." *People v. Logston*, 196 Ill. App. 3d 30, 33 (1990). "In determining how long a jury should be permitted to deliberate before a mistrial is declared and the jury is discharged, no fixed time can be prescribed, and great latitude must be accorded to the trial court in the exercise of its informed discretion." *People v. Wolf*, 178 Ill. App. 3d 1064, 1066 (1989). A reviewing court may consider the following factors in deciding whether the trial court abused its discretion: "(1) statements from the jury that it cannot agree, (2) the length of the deliberations, (3) the length of the trial, (4) the complexity of the issues, (5) the jury's communications to the judge, and (6) the potentially prejudicial impact of continued forced deliberations." *People v. Kimble*, 2019 IL 122830, ¶ 38. The circuit court is not "required to accept a jury's assessment of its own ability to reach a verdict." *Logston*, 196 Ill. App. 3d at 33.

¶ 35        Here, the trial lasted eight days, and numerous witnesses were presented. There were complex issues involved, such as the DNA evidence, that required testimony from several experts. The parties agree that the jury spent approximately 10 hours deliberating the first day and another

_____

[3]The State argues that defendant forfeited this issue because of his requests that the jury continue deliberating in response to the jury's notes, including the note indicating the jurors needed a break. We disagree and therefore address the issue on the merits.

5 hours the next day before reaching a verdict. This amount of time is not excessive when considering the length of the trial and the complexity of the issues. Although the jury advised the court three separate times that it had not reached a unanimous decision, the jury did not express a belief that it would not be able to reach a verdict. Further, when the jury was told to continue deliberations after the first two notes, it was clear the jury was doing just that, as there were additional notes requesting either more information or to view certain pieces of evidence. The third time the jury indicated a failure to reach a unanimous decision, it requested a break. Again, the jury did not indicate that it believed it would not be able to come to a verdict; the jury simply requested a break. The court ultimately provided the jury with a break by having jurors stop deliberations for the night and return the next morning. Based on the foregoing, we cannot say the court abused its discretion by denying defendant's motion for mistrial.

¶ 36                                                    III. CONCLUSION

¶ 37           The judgment of the circuit court of Will County is affirmed.

¶ 38           Affirmed.

*People v. Maggio*, 2026 IL App (3d) 250013

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Will County, No. 22-CF-2008; the Hon. Amy M. Bertani-Tomczak, Judge, presiding. |
| **Attorneys for Appellant:** | Margaret V. McQuaid, of Wheaton, for appellant. |
| **Attorneys for Appellee:** | James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, Thomas D. Arado, and Nicholas A. Atwood, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |